St. Louis, Iron Mountain & Southern Railway

Company v. Morgan.

Opinion delivered February 24, 1913.

1. RAILROADS—DISCOVERED PERIL—BURDEN OF PROOF.—Plaintiff was a railway section foreman and charged with the duty of keeping the track clear between certain points, and while riding on the track on a speeder, he suddenly discovered the approach of a train from behind, and while attempting to remove the speeder from the track, was struck and injured. *Held*, the burden of proof is upon plaintiff to show, in order to recover damages, that the employees in charge of the train discovered his perilous position in time to have avoided injuring him and negligently failed to use proper means to do so after discovering his peril.   (Page 218.)

2. RAILROADS—DISCOVERED PERIL—NEGLIGENCE.—When a railway engineer sees a section foreman on the track ahead removing a speeder from the track, the engineer has a right to presume that the foreman would clear the track after he discovered the approaching train, and the railway company will be liable only if the engineer discovered the foreman in a place of peril from which he could not extricate himself, in time to have avoided striking the foreman, and failed to use proper care after making such discovery. (Page 219.)

3. RELEASE—BURDEN OF PROOF—RAILROADS.—Where plaintiff, an employee, was injured by a railroad and accepted a settlement, and executed a release in full to the railroad for all damages received by him, the burden of proof is on him to show that there was fraud in the procurement of the release, in order to avoid the same. (Page 220.)

4. MASTER AND SERVANT—RELEASE FROM LIABILITY—CONSIDERATION.— When a part of the consideration for a release executed by an employee releasing a railroad company from liability for dam-

ages is, that the railway company will give him permanent employment at his old position at a certain wage, it will not be held that the railway company must employ him without regard to whether he discharges the duties of the place in a manner reasonably satisfactory to his employer.  (Page 220.)

Appeal from Jackson Circuit Court; *R. E. Jeffery,* Judge; reversed.

### STATEMENT BY THE COURT.

Appellee brought suit for damages for personal injuries, alleged to have been caused by the negligence of the railroad company in running him down and striking him with one of its trains, while he was attempting to remove a speeder from the track and after discovering his perilous position.

The answer denied any negligence on the part of the railroad company, plead assumption of risk and contributory negligence of appellee and also set up a settlement and release of the company from liability, executed by appellee for a stated consideration.

Appellee denied that he settled or compromised the matter complained of in the suit, as alleged, that he was paid $45 in consideration thereof and that he executed a release to appellant, discharging it from further liability thereon; alleging further that if appellant had a release it was obtained by fraud and misrepresentation of the facts.  That he was suffering greatly from the injury and was greatly impaired in mind and body and could neither read nor write and that appellant's agents and servants "falsely represented to him that he should retain his employment in the position of section foreman with the company and by such false representation, which was relied upon by him, induced him to execute some paper, the contents of which were unknown to him, but was also represented to him to be an agreement further to employ him in consideration for his refraining to make claim for his injury."

That appellant knew such representations to be false and that plaintiff believed them to be true and acted under such belief.  That if he signed the purported re-

lease, his consent was obtained through fraud and mis-representation, avoiding same.

Appellee was twenty-seven years old, had been rail-roading about a year at the time of the injury, and was section foreman of section number seven on appellant's railroad at Olyphant. He had been section foreman about eight weeks at the time of the injury, and related the occurrence as follows: On that morning he had gone on a speeder with Ed Riley over his entire section to the yard limits at Newport. They had tightened some bolts there and were returning; all the regular passenger trains due to go south until late in the evening had passed; didn't know whether the regular freight trains had or not; couldn't tell what was in the yards at Newport from where he stopped. When he started back to Olyphant and reached the south end of the river bridge he stopped and listened but didn't hear any trains, went on around the point of the curve and stopped and listened and didn't hear any trains, ran about half or a third of the way around the curve and stopped again and listened and heard nothing, then moved on around the curve probably half the distance where he stopped again and didn't hear or see any trains, and then moved on two or three telephone poles when we saw the train. Ed Riley saw it first and says: "Will, there is a train right behind us." I reached down and threw the brake on and stopped as quick as I could without throwing the wheel off; I looked back over my shoulder and saw the train, saw the engineer standing up in the cab looking ahead; I stopped the car as soon as possible, got the pick and laid it down, stepped off the end of the ties right by the side of the track and stepped back on the end of the ties, picked up my end of the car and Ed Riley picked up his end, and we started off with it; this little wheel caught on the rail. There were a lot of tools in the car, which made it heavy in the center, and which made the little wheel drop down and it looked like the engineer was stopping. I thinks to myself, if I leave that on there it is liable to cause the death of several people;

and I think I can get it off; slide it off. I reached up and was stooping over, lifting on the axle of the little wheel, and while I was doing that the cow catcher struck the little wheel and struck me, and I have been injured ever since. When I got off, Ed Riley got hold of the front wheel on my right hand side and I got hold of the rear of the speeder, and we both lifted on that side until we got it clear of the track; that took us about four feet or a little more from the outside rail; if I had remained where I set the end of the car down, the engine would not have struck me.

Q. Why go back?

A. Simply because I knew if I didn't take that wheel off it was liable to cause a wreck and kill or injure several people. This was a passenger train and the wheel was right jam against the rail on the inside of the track; the wheel was on the east side of the west rail. There is timber all along there and a man on a speeder can not see more than two telephone poles behind him. This is a straight track down there a little ways to the curve. We were struck along about mile post 265 or 266.

Appellee stated that he didn't know anything after he was struck until late that night when consciousness returned to him in St. Vincent's hospital in Little Rock. He suffered much pain and for about three weeks there was a sunk-in and blood-shotten place in his back; that he passed some blood in his urine for two weeks.

Ed Riley stated that he was with appellee on the speeder, and after the bridge watchman told them the train was four hours late, they went on down to mile post No. 266, where there was a bad large curve this side of it extending about thirty telephone poles; there were a lot of saplings grown up there to the edge of the dump. That they listened upon reaching the head of the curve about five minutes and were sitting facing each other on the speeder, appellee being on the back and looking ahead and witness on the front end. He also had turned his head and was looking ahead, expecting a train from the south; they stopped again half way around the

curve and then ran on a little way and witness looked back north and "saw the train right at us." Appellee stopped the speeder as quick as he could, grabbing the brakes, and we started to take it off. He threw the back end down at the endge of the track and the little wheel hung. We got it all off but the little end of the wheel and he went around to get it off when the train hit him. He was stooping down to get the little wheel over the rail, this wheel being hung on the inside of the rail. I was helping him to get it off at the time he was struck; he had stooped down to pick up the wheel; the train knocked him down by the car and knocked me down the dump. I got up and got back to him and got hold of him. After the train got by it stopped and backed up and took us on to Bald Knob. He was hurt in the back and was unconscious. They took him to the doctor's office, reached there about 12:30. The doctor dressed his wound. It looked like blood was running out where the pilot hit him about the region of the kidneys, just above the hip bone. They carried him from there to the infirmary at Little Rock. Witness first saw the train and said, "There comes a train." The engine was about two telephone poles, or a little further distant. He didn't see any of the train crew at the time; when he had the speeder off the track, all but the wheel, and Mr. Morgan was trying to get that off, the engine was not over a rail and a half distant from him.

If witness had kept his natural position on the speeder, he would have been looking south as the speeder was going north. He did not know how far it was from the curve to the point where the speeder was struck but there was a little straight track north of the speeder where it was taken off the track. He heard no alarm sounded, but saw the train. He told Morgan as soon as he saw it and they got the speeder off, all but the little wheel. The speeder has two large wheels that run on the same rail while the little wheel goes out on the other rail, the small wheel being the guide wheel; the heavy part of the speeder is built over the two large wheels and the little

wheel running on the other rail is stretched out from the speeder by two rods; when we got the two wheels and the body of the speeder off, we had the most of the weight of the speeder off the track.   Got the speeder clear of the track, with the exception of the little wheel, which hung on that rail.   When we got the speeder off, all except the little wheel, Mr. Morgan was clear of the track, and of the train and saw the train before he went back; he saw the train coming when he started back. When he looked back he got clear of the track, and after that stepped back and got hold of the little wheel, but he did not step over the rail then.   It was a passenger train, said to be the third section of No. 5.   After the train struck Mr. Morgan it passed by us about three car lengths.   It never touched me at all.

Con Riley, the engineer, said when there are three different sections of a running train, there is a green flag in the day time and a green light at night carried by the preceding sections that gives notice of the following section; when I came around the curve on the north end of the White river bridge I saw an object on the track about a mile ahead of me, and thought it was section men working on the track.   When I got a little bit closer I blew four blasts of the whistle, thinking they would get off, and went a little bit farther and blew a crossing whistle; when in about 600 or 700 feet from them I began sounding danger whistle and also shut off steam and applied brakes to stop train.   When I commenced sounding danger whistle they saw me and jumped off the car and jerked the car off of the track and the small wheel of the car caught on the inside of the rail and they left the car and ran away from it; when they first jerked the car off I thought they were going to take it off, and they had time to do so if they had not run away from it.   Mr. Morgan ran back and grabbed the lever that runs from the large wheel to the small wheel, and as he did so he stepped upon the track and still had hold of the lever, but before I got to him he stepped out of the track and never let go of the lever and about that time

I struck the wheel, and although I was slowed down at that time to about six or eight miles an hour, but when he came back on the track the second time I did not have time to stop. When I first started to stop I could have stopped if they had not got off the track, but they had already got off the track themselves and I thought they would take the car off; they would have gotten the car off if they had not run away from it. When he went back I could not have stopped the train. In regard to section men and men on speeders as to looking out for trains, they have a time card and know what trains are due and also have a book of rules and know that trains carry signals for following sections. This was the third section of No. 5 and I was carrying signals for the fourth section following me. A speeder would not wreck a train because it is too small. I had about a 90-ton engine pulling a passenger train with nine coaches, a fast through train, and we were running about 40 to 45 miles an hour. I do not see how it would be possible for the small wheel of a speeder to wreck a train. I judge that the speeder wheel was about eight inches high. I have never struck a speeder before.

The fireman, D. T. Owens, stated: As we came around the curve, I saw the speeder with a couple of men on it, and told the engineer and he blew the whistle; they did not show signs of getting off, and we slowed down and kept blowing it and were pretty close before they showed signs of hearing it, and finally they got off the speeder and got the speeder, all but the little wheel, off and Mr. Morgan got back to get it off and we hit the wheel. I thought they were in the clear and it seemed to me they got the car off. I was on the left hand side and Mr. Morgan was on the right hand side. They were in the clear the last time I saw them. The train gave road crossing whistles and they did not seem to hear it, and we blew danger whistles, which is just one whistle after another. The men were in the clear the last time I saw them and in safety. I suppose

after we struck the speeder we went by about three car lengths. There were nine coaches in the train.

Appellant introduced in evidence a full release, signed by appellee and witnessed by John L. Riley and R. L. Higginbotham, for the receipt of $45 which was acknowledged to have been paid. Appellee was in the hospital a month and during a part of the time walked on crutches. During Christmas week he told the doctor he wanted to go home and stated: The doctor pronounced me all right; wrote a letter and told me to take it to the claim agent, over the union depot and said he would settle with me.

Q. Told you you were all right, did he?

A. Yes, sir.

He left Little Rock on the night of the 28th, and he suffered pain continuously from that time on, and was continuously taking treatment and had been under the care of a physician. Before leaving, he went to the claim agent, as he was directed by the doctor to do and admitted that he attempted to sign the release; said the doctor told him he was able to go back to work; that he felt like he was injured, but after the doctor told him he was all right and the claim agent told him the doctor said he was all right he thought he might get well. That the claim agent told him he couldn't get anything out of the company, but that he could get his job back again permanently. That he asked the claim agent how long the job would last and he replied: "As long as you want it." The claim agent then proposed to allow him straight time during the time he was in the hospital and let him have his job back permanently, and he believed he would do what he said and he agreed to it.

Q. State whether or not you relied upon these statements made to you by Mr. Higginbotham at that time.

A. Yes, sir; that is I thought he would do what he said. That is, I signed that on the promise of the steady job; permanent job.

Q. What did he tell you as to the contents of that paper?

A. He didn't tell me anything.

Q. He didn't read it to you?

A. No, sir; didn't read it to me; he handed it to me and asked me if I could read it; handed it to me and I told him, "No, sir; I can't read it." He said, "Well, you know what it is?" I says, "I don't know whether I do or not." He says, "Well, it is just like, just what you say," and that is the last of it, never had no more with it.

Q. Just like you say?

A. Yes, sir, just like you say. I told him about what I thought I ought to have. The $45 was for what time I spent in the hospital from the first of the month to the last. I don't know whether Mr. Higginbotham called up Mr. Cherry, but he called up Mr. R. C. White, the division roadmaster, who was above Cherry. He called up White and asked him if he had my job, and if I could go to work when I got back and White told him, "Yes, he can go to work any time he gets there, he has a job in the morning if he was there to go to work." And the claim agent told me what he said. And after the claim agent wrote my pass he wrote a letter to Mr. White. I gave it to Mr. White and he started to write me a pass. I told him I already had a pass. He said, "All right, I will see Cherry tonight, he is in town, and I will tell him to put you to work the first of the month. I told him all right, that it would be the first of the month before I wanted to go to work. And he said, "All right, I will see Cherry tonight and have him put you to work the first of the month." I got the $45.

He further stated that the $45 he received was for the time he spent in the hospital. He took the doctor's note to the claim agent but said it wasn't read over to him, and he didn't know its contents. The agent opened it and read it, but not so he could hear it. He denied that the money was paid him by check and that he endorsed the check, also said that there was no one in the

office at the time of the settlement except Mr. Higginbotham and he never saw the claim agent, Riley, until the time of the trial, that the paper was not dictated to a stenographer in his hearing and that there was none in the room. He said he agreed to the release under the circumstances in consideration of the $45 and the promise of his old job back again permanently.

Higginbotham stated that he was with the claim department and settled the claim against the railway company with appellee, and took the release introduced in evidence marked Exhibit "A" to plaintiff's testimony, the long form release, that Morgan signed the release in his presence and in the presence of Riley, that he wrote all of the signature himself and wrote his name across the face of the voucher for $45. He read the release to him before he signed it and tried to get him to write through the body of the release, "This release has been read to me and I understand it," but he said he was not a very apt student at writing, but could write his name, and I said, "All right, write your name there," and he wrote his name at the bottom. I read this release to him just as it reads now and he signed it. This other paper draft No. G-1470, shows the manner in which I paid Mr. Morgan; he endorsed this draft and I gave him the money on the draft; Mr. Morgan's name and my name are endorsed on the draft, and I turned it into the bank. The name on the back of the draft is Mr. Morgan's personal signature; he wrote it and wrote all of that name. When the release was drawn the draft was drawn, and Mr. Morgan endorsed the draft and I endorsed it, and paid him the money and put the draft through the ordinary manner of payment. I did not tell Mr. Morgan, during the progress of this settlement, or at any time relating thereto that he could get his job back at any time he wanted it, and I had no authority to say such as that; no member of the claim department has any authority to say anything like that; there was a conversation about his job, but I did not tell him he could get his job back as long as he wanted it, and did

not have the authority to hire him or anybody else or to tell him that he could get his job indefinitely; I had a conversation with Mr. White and Mr. Morgan heard my end of the conversation, and I told him Mr. White said he could go back to work; I did not tell him that Mr. White said he could have his job as long as he wanted it, and Mr. White never said that, and I had no authority to tell him he could get back to work. I dictated that release to a stenographer. I did not come here on a subpoena, but on a pass. In addition to dictating the release to the stenographer in his presence, I read the release over to him, and we talked about his injuries and this matter quite a while before the settlement was made; Mr. Morgan seemed to talk intelligently and understand these matters, and he made no complaint as to the terms during the dictation or the reading; I explained to Mr. Morgan that I had the entire record and the statements and it was just after Christmas and Mr. Morgan said he had been down there at the hospital, had a wife and a baby and was a poor man and had not been able to buy his wife and baby any Christmas presents: "I am going home and want to take them something." I tried to explain to Mr. Morgan that I did not think there was any liability in the case from the facts that I had, and finally said, "What do you think you ought to get?" and he said, "I think you ought to give me $50," and I said, "I had an idea of giving you $35 or $40 myself," and we finally agreed on $45, and I thought he was pretty bright in taking it, because I did not think he was entitled to it. He was entitled to treatment in the hospital, as we all pay for that. The reason I quit the service of the company was that I lost my father and went home to take care of his farm in which I have an undivided interest.

Riley stated that he was at present claim agent for the Missouri Pacific in Kansas, and that at the date of the execution of the release claim agent for the Iron Mountain and present when the execution was witnessed and signed. That Morgan signed the

release with his own hand and he was in the room with Higginbotham talking about the settlement. That they came to an agreement and Higginbotham called a stenographer and dictated the release to the stenographer in the presence of Mr. Morgan and after it was written called him to witness Mr. Morgan's signature, which he did. I saw him sign it and also saw him sign his name across the face in addition to his name at the bottom.

Cherry stated he was roadmaster for appellant company, having the territory from Hoxie to Little Rock, except that part now under construction between Bald Knob and Cabot. Mr. Morgan sent me a book signed "W. C. Morgan," and I told him he had better have somebody else make it out, that his writing was not very good, and he said, "All right," but did not say anything about not being able to write at all. I am familiar with the rules which the section foremen and men using speeders are required to observe as to looking out for trains and I have given instructions to Mr. Morgan not to use his speeder during the noon hours, and to be careful of trains and keep in the clear with their hand cars or push cars, or whatever they use, and it is their duty to do that.

The court instructed the jury, giving among others, over appellant's objections, instruction numbered three, as follows:

"If you believe that the defendant's employees in charge of the engine drawing said passenger train saw said plaintiff and the speeder on the track for some distance ahead of them and if you believe that at the time of such discovery or at any time thereafter, the life of plaintiff or his body was in peril from such passenger train, then it was the duty of such person in charge of said train to employ all means and utilize all necessary appliances at hand to slow down and stop said train, consistent with the safety of the passengers thereon, and if you believe that at the time of the injury and at a sufficient time prior thereto for said person in charge of

said train to stop or slow down said train, plaintiff was engaged in removing the speeder from in front of the approaching train, and that he was so engaged for the purpose of preventing a wreck and derailing of said engine and said train, and you further believe that the manner in which the operators of said train acted was negligent and that the emergency causing plaintiff's injury was not due to plaintiff's negligence, then your verdict may be in favor of the plaintiff, unless you further find that the plaintiff has released defendant from such liability by the execution of a release."

The jury returned a verdict and from the judgment thereon this appeal comes.

*E. B. Kinsworthy, S. D. Campbell* and *W. G. Riddick,* for appellant.

1. Appellee was guilty of contributory negligence in not keeping a proper lookout, and in going back on the track after having reached a place of safety. 83 Ark. 69; 78 Ark. 251; 78 Ark. 355; *Id.* 520; I Shear. & Red., Negligence (5 ed.) § 99; 1 Thompson, Negligence, § 240; 97 Ark. 560; 62 Ark. 159; 48 O. St. 316; 42 L. R. A. 842; 67 N. W. 404.

On the theory that appellee was acting in an emergency, then he would be held to the degree of care that an ordinary person would observe under the same circumstances; and if he was reckless or rash he can not recover, however good his intentions or imperative the need of the persons for whom he acted. 2 Thompson on Neg. (2 ed.) § 1780; 2 Bailey on Pers. Injuries, § 497; 83 Wis. 459; 170 Mass. 168.

2. A servant assumes the usual and ordinary risks incident to his employment; also the risks of a dangerous position into which he goes voluntarily. 87 Ark. 511; 100 Ark. 380; 65 Ark. 126; 100 Ark. 380; *Id.* 156; 65 Ark. 126; 97 Ark. 486. Appellee assumed the risk due to extra or special trains as well as regular trains. 61 Md. 395; 161 Mass. 125; 80 Fed. 260; 4 Thompson on Neg. (2 ed.) § 4771.

3.  No negligence is shown on the part of the train operatives.  4 Thompson on Neg., § 4443.  The engineer had the right to assume that the section men on the hand car knew of the train's approach, etc., and was bound to use all his efforts to stop only when it appeared that they were not aware of the approach of the train and were not likely to leave the track in time to avoid collision. 67 N. W. 404; 90 Ark. 403.  The burden was on appellee to prove that there was time to stop the train and avoid injuring him after he returned to the track.  97 Ark. 560.

4.  The proof fails to show fraud in the execution of the release.  116 Fed. 913; 79 Ark. 356; 99 Ark. 442; 98 Ark. 48; 97 Ark. 268; 111 Minn. 193; 116 Fed. 93; 129 Mo. 629; 71 Miss. 1029; 61 Kan. 758; 75 Ark. 266; *Id.* 72; 71 Ark. 614; 74 Ark. 336; 70 Ark. 512; 95 Ark. 375; *Id.* 523.

5.  Instruction 3 given by the court errs in ignoring the rule of law that the train operatives were under no duty to act until they discovered appellee's peril, and makes appellant liable because of the mere fact of the peril of the plaintiff.  90 Ark. 413; 46 Ark. 513.  The instruction also errs in making appellant liable if appellee received his injury in an attempt to prevent a wreck, etc., and in assuming that he was acting in any emergency.  It was for the jury to say whether an emergency existed.  66 Ark. 506; 71 Ark. 38; 76 Ark. 468.

*Jones & Campbell,* for appellee.

1.  Contributory negligence is a defense the burden of proving which is upon the defendant.  81 Ark. 276; 67 Ark. 384.  Under the facts in this case it will not be inferred that appellee was negligent when he could not have seen the train even if he had looked.  100 Ark. 527.

2.  The evidence shows negligence on the part of the train operatives.  When the person in charge of a train observes the perilous position of one on the track, it is his duty to employ all means and utilize all necessary appliances at hand, consistent with the safety of the passengers thereon, to stop the train.  89 Ark. 496

and cases cited; 99 Ark. 423; 94 Ark. 524; 87 Ark. 628; 96 Ark. 347; 74 Ark. 407.

3. There was no negligence in the attempt to remove the speeder. Negligence will not be imputed to one who endangers himself in an effort to save human life unless he acts recklessly and rashly. 1 Thompson on Neg., § 198; 82 Ark. 11; 92 Ark. 560; 43 N. Y. 503; 115 N. Y. 22; 83 Mo. 560; 104 Mass. 137; 195 Pa. 461; 152 N. C. 505; 132 S. W. 95; 81 S. W. 998; 18 L. R. A. 827.

4. The doctrine of assumed risk does not apply in this case. The rule that a servant does not assume the risks growing out of the master's negligence is as well settled as that ordinarily he assumes the risks incident to his employment. 90 Ark. 223.

5. The release was fraudulent and void because (1) of a misrepresentation of a material fact made for the purpose of inducing the execution of the paper, and (2) a misrepresentation of a material part of the writing and a material fact which went to its execution. 94 Ark. 524; 87 Ark. 624; 9 Cyc. 411.

6. The appellant's objections to the third instruction are without merit; but if it had any meritorious objections to the instruction they should have been presented in specific form to the trial court. 65 Ark. 255; 73 Ark. 594; 76 Ark. 468; 99 Ark. 226; 100 Ark. 269.

Kirby, J., (after stating the facts). It is insisted by appellant that there is no testimony sufficient to warrant a verdict against it, nor to avoid the release executed by appellee upon a settlement of his claim for damages for the injury inflicted.

It was the duty of appellee to keep the track in condition for the passage of trains, to take notice of the operation of all trains upon the road, so far as the observation of them was necessary to the performance of his duty and the protection of himself and his men and to keep the track clear and free of obstructions for the operation of trains upon the road including any furnished by himself and his men in the performance of their duties. He had been over his section in the morn-

ing with one of his men and they were returning from the other end at the time of the injury, after having been notified by the bridgeman that a certain train was four hours late, which usually passed along there about that time. Appellee states that he was not aware that passenger train No. 5 was running in sections; that he paid no attention to the signals upon the train and was not expecting a train, except from the south. And, although he had another man on the speeder with him, who sat facing to the north, both of them testified that they were looking towards the south as they proceeded that way. Their testimony, it is true, shows that they exercised some care, both at the beginning of the curve and at one or two places in rounding it, to ascertain the approach of trains, but the fact remains that they had passed the curve a long way before the accident occurred, and did not discover the approach of the train from the north until it was close upon them. Upon discovering it, they immediately set about removing the speeder, lifted the front end of it from the track four or five feet and were both in the clear, when they discovered that the little hind wheel had lodged on the inside of the rail and appellee turned and took hold of the connecting rod and continued trying to remove it until it was struck by the train and he was injured.

It was his duty, as already said, to clear the track of any obstruction that might otherwise result from his use of it with the speeder to this approaching train and to discover the approach of the train in time to clear the track, but if it be said that he was negligent in failing to discharge his duty, it would not excuse the railroad company for injuring him, if it failed to use the proper care to prevent injury to him after he was discovered to be in a position of peril.

The evidence is undisputed that a lookout was kept by the trainmen, that the speeder was discovered more than a mile away when the train was going at 40 to 45 miles an hour; that warnings were given, crossing whistles blown and danger signals and when the men on the

speeder gave no evidence nor showed any signs of being aware of the approaching train, the engineer slowed down the speed of his train and had gotten it under control where he could have stopped it before reaching and striking the speeder, if the men had not attempted to remove it, and he had not thought that they had removed it and were in the clear, or would be by the time he reached them. He stated that both men after discovering the train, jumped off of the speeder, took hold of it and carried the front end of it four or five feet from the track; that he saw they were removing it, that they were in the clear and had time to complete the removal of it before he would reach them. That later, when he discovered that Morgan had again taken hold of the back end of the speeder and the little hind wheel had not been removed from the track, he could not stop the train in time to avoid the accident, although it was running slowly at the time and then there was no danger of a wreck from striking the speeder.

The testimony of all the witnesses shows that the men on the speeder discovered the approaching train in time to have removed it from the track if the wheel had not hung on the rail and that they did remove the front end of it and were entirely in the clear and in places of safety themselves before the train reached them. Appellee stated that before stooping over to try to release the little wheel to remove it, he looked and saw the engineer standing in the cab, looking at him, and thought the train was going to stop.

The engineer had the right to rely upon the presumption that appellee would clear the track of the obstruction and remove himself to a place of safety, until he discovered that he would not do so, for it was only then that he would have known him to have been in a perilous position.

The burden of proof was upon appellee to show, in order to recover damages, that the employees in charge of the train discovered his perilous position in time to have avoided injuring him and negligently failed to use

proper means to do so after discovering his peril. *St. Louis, I. M. & S. Ry. Co.* v. *Watson*, 97 Ark. 560-564; *St. Louis & S. F. Rd. Co.* v. *Townsend*, 69 Ark. 380; *Chicago, R. I. & P. Ry. Co.* v. *Bunch*, 82 Ark. 522.

The engineer saw appellee get off the speeder and remove the front end of it from the track, and thought, as he had a right to do, that it all would be entirely removed before his train reached the place, unless he sooner discovered the speeder was hung and that appellee was going to continue to try to remove it and was in a place of danger. Appellee said he saw the engineer looking at him and thought the train was going to stop and he continued to try to remove the speeder, thinking he could do so and that it was necessary to do it, in order to prevent a wreck.

Under these circumstances, we are not able to say that there was not sufficient testimony to have submitted the question of negligence on the part of the railroad company in failing to use proper means to stop the train and avoid the injury after the peril of appellee was discovered.

Said instruction numbered three, however, does not correctly state the law. It told the jury that it was the duty of the enginemen in charge of the train to employ all the necessary means and appliances consistent with the safety of the passengers of the train to slow down and stop it, if they discovered the appellee with his speeder on the track some distance ahead of the train and the jury believed that at the time of such discovery or at any time thereafter the appellee's life or body was in peril from such passenger train. It also told them that if they believed at the time of the injury, or a sufficient time prior thereto for them to stop or slow down said train, appellee was engaged in removing the speeder from the track in front of it and was so engaged for the purpose of preventing a wreck of the train and they believed that the manner in which the operatives of the train acted was negligent and that the emergency caus-

ing appellee's injury was not due to his negligence they should find for him.

The instruction took away from the jury entirely the consideration of the question of the engineer's right to assume that appellee would clear the track of his speeder after he discovered the approaching train, and of their judgment that he had done so and told the jury that if he was imperiled from the train any time after his discovery by the enginemen and they could have stopped the train it was necessary for them to do so and if they discovered him so engaged a sufficient time prior thereto and he continued engaged in removing the speeder, in the honest belief that it was necessary to prevent a wreck, that the company was liable if the manner of the operation of the train was negligent and the emergency was not caused by appellee's negligence.

This question has nothing to do with the case and should not have been submitted at all. The only question in it was whether the enginemen discovered appellee to be in a position of peril from which he could not extricate himself in time to have prevented the injury to him and failed to use proper care to avoid the injury after such discovery.

It is next contended that the release executed by appellee was valid and that the court erred in not declaring it so.

The answer alleges that it was obtained fraudulently by false representations to the appellee inducing him to sign it, the particular representations relied upon to avoid it being that the employees of the claim department told appellee that they would give him $45 in settlement and permanent employment in his old position and that the release as executed recited this fact. No reliance is placed upon any misrepresentation of the existing physical condition of appellee by the doctors at the time of sending him from the hospital, nor any representation by them as to the time required for the complete recovery from the injury. The evidence may be

regarded undisputed thus far.  The claim agent admitted that he told appellee he did not consider the company liable for his injury; that he would give him $45 on account of it, as that would about pay him for the time lost and appellee then suggested that he would like to have his old place back and the claim agent assured him that it would be given to him.  He called up the roadmaster on the phone, in appellee's presence and hearing, and after he finished talking told appellee the roadmaster said he cold have his old place back again any time he was ready to go to work.  Appellee took a letter from the claim agent to the roadmaster and was likewise informed by him that he could have his place again; and he did go back and was given his old position.  He, himself, does not state that the claim agent told him that the agreement or stipulation that he should have his old position back permanently was recited in the release.  Nowhere does he claim that, except in the answer, but only says that that was a part of the consideration for the release and agreed upon by the employees of appellant and himself, and but for it he would not have signed the release at all.

Waiving the determination of the question of whether such a representation so made of a promise to employ in the future without any false statement as to any such stipulation being contained in the release at the time of its execution would constitute such a false representation as would avoid the release, it would certainly be necessary in order to avoid the effect of the release if it be held that such promise was a part of the consideration therefor, that the promise was made without any intention to perform or fulfill it and to induce appellee to sign an instrument, which he would not otherwise have executed.  The burden of proof is, of course, upon him to show such circumstances, as would relieve him from the effect of a release which he admits having signed, and although he states that he was "fired" from his old position shortly after it was given back to him, he does not deny that it was because of incompetency

or inefficiency in the discharge of his duties, as testified to by the roadmaster who relieved him of employment. The burden being upon him, he can not escape the effect of the release without showing that fraud was practiced upon him in its procurement and if the agreement he claims to have been made to permanently employ him at his old position at a certain wage was made by those in authority to employ him, it certainly can not be held that he should be so employed without regard to whether he discharged the duties of the place in a manner reasonably satisfactory to his employer.

For the error in the giving of said instruction numbered 3, the judgment is reversed and the cause remanded for a new trial.