## ELIZABETH WOLD CEDERSTRAND v. LUTHERAN BROTHERHOOD.

117 N. W. (2d) 213.

September 14, 1962—No. 38,455.

*Robert L. Van Fossen, Dorsey, Owen, Barber, Marquart, Windhorst & West, Henry Halladay,* and *Bernard G. Heinzen,* for appellant.
*Arthur C. Wangaard, Doherty, Rumble & Butler, R. J. Leonard,* and *M. J. Doherty,* for respondent.

ROGOSHESKE, JUSTICE.
This is an action for damages arising out of a contract of employ-

ment. Plaintiff appeals from the trial court's order granting judgment notwithstanding a jury verdict in her favor and ordering a new trial in the event of a reversal; also from the judgment entered thereafter.

Plaintiff, an employee of defendant, claims that she was discharged by defendant without cause contrary to a provision of an employment contract existing in April 1955 when her employment was terminated. The primary and decisive question presented is whether the evidence, viewed most favorably to plaintiff, was sufficient to establish that the employment contract, of the type she claimed, embodied a provision securing her against dismissal except for cause.

The evidence so viewed could have established that plaintiff was a long time, faithful, and dedicated employee of defendant, a non-profit fraternal benefit insurance society. The society was established in 1917, its membership being limited to those baptized in the Lutheran faith or affiliated with a Lutheran church organization. Its primary activity is issuing benefit certificates providing for payment of benefits in case of death or disability to its members. It is not represented as a commercial enterprise, but rather as a religiously orientated and motivated fraternal association designed "to aid the Lutheran Church in extending the Lutheran faith, to foster patriotism, loyalty, justice, charity, and benevolence, * * * to encourage industry, saving, thrift, * * * to give aid in case of poverty, sickness, accident, or other misfortunes, * * * and otherwise to promote the spiritual, intellectual and physical welfare of its members." As provided in its bylaws, its management is vested in a Board of Directors elected by the General Convention, an Executive Committee, and the usual officers elected by the Board, each and all being subject to the General Convention in which is vested final authority. J. A. O. Preus, one-time governor of Minnesota, was its first secretary-treasurer and has been chairman of the Board for 40 years. During the period in question, Herman L. Ekern was president until 1951 when he was succeeded by Carl F. Granrud, who is presently serving in that office. Lorenz Jost, who became plaintiff's immediate superior, has been treasurer from 1955 to 1959 and for 10 years prior thereto he was comptroller. During the period of plaintiff's employment and at least prior to 1931, all

of defendant's employees were required to purchase insurance of at least $1,000, thereby becoming a member of defendant with all attendant rights and duties, including liability for assessment in case of insolvency. As business grew, the number of employees increased from a mere handful to about 225 at the time of trial.

In 1922 plaintiff became a part-time employee and in 1928 she was employed full time. At first she was assigned duties of a stenographer, bookkeeper, and auditor of accounts. In 1930 she was assigned the title of cashier and assistant to the corporation officer in charge of personnel. In 1945 she became personnel supervisor, and in 1951 she was designated cashier, personnel director, and office manager. For many years, prior to and up to the time her request for a leave of absence was granted, she had, under the supervision of a corporate officer, general duties and responsibility for payroll accounting; for writing checks including payroll checks; for supervising the switchboard operators and the receptionist; and for the total employment function including recruiting, interviewing, testing, selecting, employing, counseling, assigning, and supervising personnel under her charge. Although not a corporate officer under defendant's bylaws, she had advanced to an executive status in duties and responsibilities as well as salary which, in 1954, had reached $7,300 per year. As a part of her duties she assisted her corporate supervisor in recording, if not in formulating, the employment policies of defendant as they were developed and established. She kept current a book in the nature of an office manual entitled "Control Copy of Personnel Policies and Practices of Lutheran Brotherhood," hereinafter referred to as exhibit Y. Although designated a copy, only one such manual existed. She also prepared various editions of an employee's handbook and employee's bulletins containing such parts of the employment policies and practices of defendant as were published for direct communication and distribution to employees.

Exhibit Y, a 42 page loose-leaf paper-covered booklet, was compiled with the knowledge and authority of her immediate corporate supervisor. As the title suggests and the "index" confirms, it was a manual used by plaintiff and perhaps other supervisors. The subjects

covered changed and increased as the number of employees and defendant's personnel problems increased. By far the larger part is devoted to matters of trivial nature from such subjects as collections for gifts and time off for funerals to the gratuitous distribution of vitamins to office personnel. However, quite a number deal with matters of substance such as pension fund, maternity and sick leave, and that new employees shall be considered as "temporary" for at least a period of 3 months and not more than 6 months and that "they do not become 'permanent' employees unless the possibility of continued employment is mutually satisfactory." As early as 1930 it contained the following provision: "A person is not dismissed without cause, and it is customary to give a warning and an opportunity to 'make good' before final dismissal." Although this is the only reference to this subject, the wording remained unchanged during the entire existence of the manual. This provision never appeared in the handbook or bulletins distributed to employees. However, the "policy and practice" it expressed, as well as all other provisions, were referred to by plaintiff in the performance of her duties as personnel director. It was also mentioned, and perhaps discussed, with unestablished frequency among some unnamed employees at unspecified times and circumstances. On some unspecified occasion or occasions, it was likely mentioned or discussed by two corporate officers, President Ekern, now deceased, and Mr. Fred C. Mueller, a retired secretary of defendant who testified for plaintiff. Similarly, on some unspecified occasion or occasions it was shown to President Granrud and other undesignated successor officers.

Sometime in 1931 President Ekern met with the then 30 to 50 employees to announce the formulation of a retirement plan called the "Home Office Retirement Program". In explaining the benefits to the employees and urging them to approve the same he is quoted as saying that "there would be no dismissals as long as people showed willingness to work and the ability and wanting to learn" and that "there was chances for advancement and people could have a job as long as they wished until retirement." He was further quoted as saying that defendant "was one of the finest companies to work for and as long

as the company grew the people that stayed there the longest had the chance to build up for higher jobs and there was no reason for dismissal as long as [they] wanted to work and were willing to learn the details of the company, anything that helped the company's progression." The inauguration of the plan was not conditioned upon a vote of approval of the employees, but an oral vote was taken and, with a few exceptions, the employees were in favor of it. Under its terms each employee deposited 5 percent of his salary and defendant underwrote the plan contributing from 2½ percent to 10 percent of the employee's salary depending upon the length of service. Upon termination of employment the employee could withdraw the amount deposited by both, 25 percent immediately upon leaving defendant's employ and all or any part after one year's notice. The 1931 plan was modified in 1955 but has remained essentially the same, being at all times subject to any change or termination as the Board of Directors saw fit. Plaintiff was present at the meeting and voted in favor of the plan and became a participant in it.

In 1931 or 1932, when defendant was experiencing the effects of the general economic depression, plaintiff and other employees, upon defendant's solicitation for funds to strengthen its borrowing capacity, purchased a "few hundred" dollars of unsecured, interest bearing "surplus notes".

In January 1954 plaintiff's husband was elected Potentate of Zuhrah Temple of the Shrine. Shortly thereafter she advised President Granrud that her responsibilities to her husband and his office would entail time away from her job, and she mentioned the possibility of a leave of absence. President Granrud discouraged that possibility. There were absences from time to time and her superiors criticized her for this. During the year she persisted in urging a leave in conversations with President Granrud and Mr. Jost, and on the last occasion she requested either a leave of absence or a respectable retirement income. On October 8, 1954, the Executive Committee granted her a 6 months' leave of absence without pay. She went on leave October 18.

Her services up to this point were completely satisfactory to defendant, her only difficulty having been a failure to complete a

departmental study of job specifications and salary classifications requested by Mr. Jost in February 1954. Her failure was excusable because the time period specified was unreasonably short. As it was not completed, plaintiff, at the time she was requesting a leave, recommended that a job evaluation and merit rating program be set up by either employing an experienced personnel director or by retaining a consultant with whom she expressed her willingness to cooperate. At the time the Executive Committee granted plaintiff a leave of absence it authorized the employment of an experienced personnel director; and Mr. Jost so informed plaintiff and also that, upon her return, an adjustment in her salary might be necessary. Plaintiff made no objection or comment. Although no one told her directly, it is fair to summarize that defendant, by its president and her immediate superior, through word and act, permitted plaintiff to believe that upon her return she would be reemployed and assigned to her same duties, unless a personnel director was employed, in which event she would be assigned to a position comparable to her previous duties and responsibilities but at an adjustment in pay.

During the period of her leave of absence she made herself available as required for special work, maintained her professional interests and associations, and kept abreast of developments in the personnel field. She worked from time to time on evenings and Saturdays and was paid one-half month's salary at her annual rate. A personnel director was hired, and he occupied that position when plaintiff returned on April 18, 1955.

A week before plaintiff's leave expired she telephoned Mr. Jost to verify the date of her return. He told her that there was no opening in personnel but that he had another position for her. Prior to her return, President Granrud and Mr. Jost on numerous occasions suggested to the personnel director that he would not want plaintiff back in his department. At the time of plaintiff's return the personnel director could have used experienced help. Upon her return plaintiff was offered the position of counter clerk and receptionist. She said this was a "shock" to her and she would have to think it over. Mr. Jost told her she could discuss it with President Granrud if she liked. After

a delay because of the president's absence she had several conversations with him and other officers of defendant, finally informing President Granrud that she accepted the position offered "if that is all there is." On April 28 she so advised Mr. Jost by telephone and he replied that "the job was not open" and he would send her an explanatory letter. The next day she received the letter stating that, due to her unwillingness to fill the position assigned to her on her return, her services were terminated as of April 28. Following this, plaintiff's further conversations with Mr. Jost and President Granrud resulted in a suggestion that she resign and receive 3 months' pay, which she declined, and that there might be a place for her in the new building under construction by defendant. Finally, in a letter from President Granrud, enclosing a check for $2,797.96, plaintiff was advised this would keep her on the payroll for a sufficient length of time for her to become eligible under the new pension plan. Plaintiff has neither cashed the check nor been offered any kind of position with defendant. She remains ready, willing, and able to accept the position of counter clerk and receptionist offered or a position comparable to the one she had.

It is plaintiff's contention that, before 1930, there existed a unilateral employment contract between plaintiff and defendant arising out of an offer by words and conduct of defendant, and an acceptance by plaintiff's entering upon and performing her duties as an employee. She claims that, through a similar manifestation of intention, the original contract of employment at will was modified by a provision that she could be dismissed only for cause. The specific terms are that she was promised if she continued her faithful service or forbearance from seeking other employment, purchased the required minimum of life insurance, participated in the retirement plan, loaned money to defendant, or did any or all of the foregoing, defendant would then continue to keep her and discharge her only for cause. She contends that the authorized promise or offer securing her against dismissal without cause was extended by the speech of President Ekern and was also reduced to writing and continuously reiterated in exhibit Y; that the words were given meaning and the character of a contractual promise by the acts of the parties, the character of defendant's operation, the

relationship between employer and employees, defendant's economic condition, the stature in secular and religious circles of defendant's officers, and all other circumstances shown. She further claims that such contract was in existence at the time in October 1954 when she took her leave of absence and that, except as it was modified by agreement with defendant, she was entitled upon her return to the job and salary she had left. She alleges that there was a modification to the extent that, if another personnel director was hired, she would have a position of comparable status, duties, and responsibilities, and that there might be some adjustment in salary.

Lastly, she asserts that, by refusing to give her such a position on her return, and dismissing her when she declared her willingness to accept a clerk or receptionist position if nothing else was available, she was thus dismissed without cause in violation and breach of a binding unilateral contract. She claims damages for lost salary and retirement benefits.

It is the position of defendant that no such contract ever existed. It is claimed that the speech of President Ekern was merely a statement of company policy, and was in no way intended to be any sort of contractual promise; further, that Ekern did not have authority to make any such offer as plaintiff claims. Exhibit Y is asserted to be little more than a collection of plaintiff's own notes, not binding in any way upon defendant; that it was at most a collection of company policies and intentions; and in no way was it a promise or offer which could form the basis of a contract embodying the provision claimed.

It is further contended by defendant that there was no contract granting plaintiff security from dismissal without cause, as there was no consideration given by plaintiff that was demanded in return for any such promise by defendant. Plaintiff's vote for and participation in the retirement plan, purchasing the notes and insurance, and remaining on her job were acts of her own free will, and not done in reliance on or as an acceptance of any promise of immunity from discharge without cause.

At the close of the evidence, defendants' motion for a directed verdict was denied. The case was submitted to the jury on all issues

save the authority of Ekern, which the court held existed as a matter of law. Implicit in the jury verdict awarding substantial damages to plaintiff, is a finding that a contract securing plaintiff against dismissal only for cause existed and that she was dismissed without cause.

Defendant then moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The court granted the motion for judgment notwithstanding the verdict, and also, in the event of a reversal on review, granted a new trial for various errors in instructions and insufficiency of evidence.

In a comprehensive memorandum attached to the order, the court explicitly outlined the basis for its order. The court determined that the evidence in plaintiff's favor was clearly insufficient to establish the basic elements of an offer, acceptance, and consideration for the kind of contract claimed by her. The speech of Ekern in 1931 was held not to be a promise but only a declaration of policy. The court stated that even if it were construed as a promise it could not be an offer, the acceptance of which would create a contract of the kind claimed, for it was not in its terms conditional upon any act or forbearance on the part of plaintiff.

Exhibit Y was held to be equally unavailable as a foundation for such contract as plaintiff claims. It was not a written declaration related to Ekern's speech for such statements had been in existence for about a year prior to the speech and it must be considered separately in context with the full contents of the manual and its use as a mere recital of general policy, not a promise. The court stressed the lack of plaintiff's reliance on the discharge provisions of exhibit Y, noting that she failed to point it out to new employees, and that she neither considered it nor treated it as a fundamental employee-employer contractual provision in performing her personnel duties.

The court then found that, even if an offer were assumed arguendo, there could not have been acceptance by plaintiff as no acts were required of her that could have constituted legal consideration for the offer. The court dismissed promissory estoppel, saying that the case had not been tried on that theory and that an essential prerequisite of that doctrine, the existence of a promise, was lacking.

The court continues, justifying its alternative grant of a new trial on insufficiency of the evidence and error in the instructions relating to consideration and damages.

On her appeal, plaintiff makes several assignments of error. On the pivotal issue presented they are that the trial court erred in holding the evidence insufficient to establish an offer, acceptance, and consideration sufficient to make any promise of defendant, if existent, binding. Those dealing with the court's order granting a new trial need not immediately concern us.

In addressing ourselves to the determinative question we must keep uppermost in our minds that plaintiff does not claim a general contract between defendant and all employees; her entire claim is predicated upon a unilateral contract granting job security and arising out of a promise to her and an acceptance by her.

We must also have in mind certain fundamental principles basic to the law of contracts. The task of outlining the essential requirements of law for the formation of an informal contract, and analysis of the practical problems of contractual definition of the basic elements, were recently undertaken in Baehr v. Penn-O-Tex Oil Corp. 258 Minn. 533, 104 N. W. (2d) 661. The principles that must guide us were so comprehensively stated that we feel constrained to quote at considerable length rather than to essay the task anew. It was there stated (258 Minn. 537, 104 N. W. [2d] 664):

"* * * Unfortunately, contract, like most of the basic terms constituting the intellectual tools of law, is conventionally defined in a circular fashion. By the most common definition, a contract is a promise or set of promises for the breach of which the law gives a remedy or the performance of which the law recognizes as a duty. Restatement, Contracts, § 1; 1 Williston, Contracts (3 ed.) § 1; see, 17 C. J. S., Contracts, § 1. This amounts to saying that a contract is a legally enforceable promise. 1 Corbin, Contracts, § 3; 12 Am. Jur., Contracts, § 2. But a promise is legally enforceable only if it is a contract. Thus nothing less than the whole body of applicable precedents suffices to define the term 'contract'.

"Although the definition of contract does not help much in determin-

ing what expressions shall be held to impose legal obligations, it does direct attention to a promise as the starting point of inquiry. Both in popular and legal usage, a promise is an assurance, in whatever form of expression given, that a thing will or will not be done. Webster's New International Dictionary (2 ed.) (1947) p. 1980; Holmes, The Common Law, p. 299. While we must take care to distinguish between statements meant to express merely present intention and those meant to give an assurance as to a future event, McCarty v. Nelson, 233 Minn. 362, 370, 47 N. W. (2d) 595, 599; In re Estate of Sickmann, 207 Minn. 65, 289 N. W. 832; Carlson v. Krantz, 172 Minn. 242, 214 N. W. 928, 54 A. L. R. 545, this involves no more than the common difficulty of seeking precise meaning in the usually imprecise, and often careless, expressions of ordinary colloquy.

\* \* \* \* \*

"However, the fact that a promise was given does not necessarily mean that a contract was made. It is clear that not every promise is legally enforceable. Much of the vast body of law in the field of contracts is concerned with determining which promises should be legally enforced. On the one hand, in a civilized community men must be able to assume that those with whom they deal will carry out their undertakings according to reasonable expectations. On the other hand, it is neither practical nor reasonable to expect full performance of every assurance given, whether it be thoughtless, casual and gratuitous, or deliberately and seriously made.

"The test that has been developed by the common law for determining the enforceability of promises is the doctrine of consideration. This is a crude and not altogether successful attempt to generalize the conditions under which promises will be legally enforced. See, Ballantine, *Is the Doctrine of Consideration Senseless and Illogical?*, 11 Mich. L. Rev. 423, Selected Readings on the Law of Contracts, p. 588. Consideration requires that a contractual promise be the product of a bargain. However, in this usage, 'bargain' does not mean an exchange of things of equivalent, or any, value. It means a negotiation resulting in the voluntary assumption of an obligation by one party upon condition of an act or forbearance by the other. See, Ames, *Two Theories*

*of Consideration,* 12 Harv. L. Rev. 515; Id. 13 Harv. L. Rev. 29, Selected Readings on the Law of Contracts, p. 320. Consideration thus insures that the promise enforced as a contract is not accidental, casual, or gratuitous, but has been uttered intentionally as the result of some deliberation, manifested by reciprocal bargaining or negotiation. In this view, the requirement of consideration is no mere technicality, historical anachronism, or arbitrary formality. It is an attempt to be as reasonable as we can in deciding which promises constitute contracts. Although the doctrine has been criticized, 1 Chitty, Contracts (21 ed.) par. 80, p. 40; Pound, An Introduction to the Philosophy of Law, p. 236, et seq., no satisfactory substitute has been suggested. It is noteworthy that the civil law has a corresponding doctrine of 'causa' which, to the eye of a common-law lawyer, is not much different than consideration. Lorenzen, *Causa and Consideration in the Law of Contracts,* 28 Yale L. J. 621, Selected Readings on the Law of Contracts, p. 565.

"Consideration, as essential evidence of the parties' intent to create a legal obligation, must be something adopted and regarded by the parties as such. Suske v. Straka, 229 Minn. 408, 39 N. W. (2d) 745; Nybladh v. Peoples State Bank, 247 Minn. 88, 76 N. W. (2d) 492; 12 Am. Jur., Contracts, § 75; 17 C. J. S., Contracts, § 74. Thus, the same thing may be consideration or not, as it is dealt with by the parties. Holmes, The Common Law, p. 292. In substance, a contractual promise must be of the logical form: 'If . . . (consideration is given) . . . then I promise that . . .' Of course, the substance may be expressed in any form of words, but essentially this is the logical structure of those promises enforced by the law as contracts. See, e. g., Hartung v. Billmeier, 243 Minn. 148, 66 N. W. (2d) 784."

It should be emphasized, as plaintiff correctly urges, that in a unilateral contract "the exchange for the promise is something other than a promise",[1] when the promise takes the form of an offer it is the promisee's performance of all or part of the acts requested. Such performance ordinarily indicates acceptance as well as furnishing the

[1]Hartung v. Billmeier, 243 Minn. 148, 66 N. W. (2d) 784, 39 Minn. L. Rev. 899; Restatement, Contracts, §§ 12, 52.

consideration. Furthermore, an offer, as well as a manifestation of mutual assent essential to the formation of a contract, may be inferred wholly or partly from words spoken or written or from the conduct of the parties or a combination thereof.[2] Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively.[3]

Applying these principles to the present case, it appears that no such contract as plaintiff relies upon existed. If, at the time that she returned from her leave of absence, there was a provision of her employment contract that she should not be dismissed without cause, it needs to have been based upon some promise or offer by her employer, the acceptance of which became binding through passage of consideration. Examination of the evidence in the case pertaining to each of these facets of a contract reveals insufficient support for plaintiff's claim.

The usual employer-employee relationship is terminable at the will of either; the employer can summarily dismiss the employee, the employee is under no obligation to remain at the job. Brown v. Safeway Stores, Inc. (E.D.N.Y.) 190 F. Supp. 295. A hiring for an indefinite term is terminable at will. Skagerberg v. Blandin Paper Co. 197 Minn. 291, 266 N. W. 872. Unless plaintiff can establish that she was to be dismissed only for cause by proving a contract to that effect, her employment could be terminated at any time and without cause.

Modification of "at will" hirings by an enforceable contractual agreement that the employee shall be discharged only for cause is quite a familiar provision of collective bargaining agreements between unions representing a group of employees and an employer. See, Rowan v. K. W. McKee, Inc. 262 Minn. 366, 114 N. W. (2d) 692; Cox, *Rights Under a Labor Agreement,* 69 Harv. L. Rev. 601, 613.

---

[2]Restatement, Contracts, §§ 5, 21; Dybvig v. Minneapolis Sanatorium, 128 Minn. 292, 150 N. W. 905.

[3]Restatement, Contracts, § 20, *comment a*; Stong v. Lane, 66 Minn. 94, 68 N. W. 765; Benedict v. Pfunder, 183 Minn. 396, 237 N. W. 2; Cut Price Super Markets v. Kingpin Foods, Inc. 256 Minn. 339, 98 N. W. (2d) 257; Williston, *Mutual Assent in the Formation of Contracts,* 14 Ill. L. Rev. 85, Selected Readings on the Law of Contracts, p. 119.

Such a provision is an employment condition guaranteeing tenure and job security against the whim or caprice of an employer allowing discharge only for "legal cause"—some cause inherent in and related to the qualifications of the employee or a failure to properly perform some essential aspect of the employee's job function. Local 205, United Elec., R. & M. Workers v. General Elec. Co. (D. Mass.) 172 F. Supp. 53; Quick v. Southern Churchman Co. 171 Va. 403, 199 S. E. 489; Norfolk Southern Ry. Co. v. Harris, 190 Va. 966, 59 S. E. (2d) 110. Where the causes for which dismissals are warranted are not specified in the contract, such a provision is indeed a very stringent limitation on an employer's freedom to dismiss an employee. State ex rel. Hart v. Common Council, 53 Minn. 238, 55 N. W. 118. Therefore, while it is currently common to find such an employment provision, we recognize the fact that it is a considerable sacrifice of employer discretion, and is usually arrived at only through negotiation and mutual bargaining.

The large volume of evidence covering, as it must, the many contracts between the parties unquestionably permitted the jury to infer, and therefore to find, that President Ekern in his speech did indicate that no employee would be dismissed without cause and that he did in fact, at some occasion or occasions, make an unequivocal statement to that effect. Further, such a statement appears without dispute in exhibit Y. But, can it be said that the evidence indicates more than that such was the consistent policy of defendant? We think not. The question is rather one of intention to make such a promise as an offer and to be bound by it. We can and must seek that intent "by applying the words used, with all their reasonable implications, to the subject matter as the parties themselves, under all the surrounding circumstances, must have applied, used, and understood them." Hartung v. Billmeier, 243 Minn. 148, 151, 66 N. W. (2d) 784, 788.

Ekern's speech, made to a group of some 30 to 50 employees, does not contain the indicia of intent to contract. He was discussing a pension plan, which would eventually inure to the employees' benefit, and asking their approval. The remarks in the record show that he was extolling the qualities of Lutheran Brotherhood as a place to work and

saying that, as long as there was willingness to work and the ability and wanting to learn, there would be no dismissals. The tone of bargaining or negotiating in the statement quoted is clearly lacking.

There are other circumstances negativing an intent to make an offer. The scarcity of employment and the economic instability of the years tend to show that Lutheran Brotherhood was giving its employees something rather than demanding something. The timing, the informal nature of the statements, and in fact the terms of the retirement plan itself make it more likely that Ekern was telling the employees of the Brotherhood's policies and plans designed for their benefit; not making a blanket offer of job security to all employees in exchange for faithful service and approval of the pension plan.

Plaintiff contends that the avowed Christian principles of Lutheran Brotherhood, its aims and policies, all point to the reinforcement of the promise made by Ekern. A more logical conclusion from the evidence is that his quoted statements and conduct were a testimony of the Christian precepts which were guidelines for company policies and principles, not a separate contractual obligation.

That a similarly worded policy was to be found in exhibit Y supports this conclusion. Although found among some serious employment terms, it was also accompanied with matters of a trivial nature. The title "Control Copy of Personnel Policies and Practices of Lutheran Brotherhood" suggests that the booklet was only a collection of general policies, not an offer of contractual character. The fact that the dismissal provision was not included in the Employee's Manual, given to new employees explaining important personnel regulations, indicates that plaintiff did not consider it as a provision of her employment relationship. There is no showing that she ever called this provision to the attention of any employee in discharging her duties as personnel director. The fact that it was not important enough to be included in the employee's handbook or employee's bulletins indicates forcefully that during its entire existence it was not regarded as a contractual offer to all employees, but merely as a policy guide for supervisory personnel.

Plaintiff claims, however, that as to her this statement in the manual

and Ekern's speech were understood as an offer, and that her acts of acceptance were sufficient consideration to bind defendant to a contract of the kind claimed.

We have long recognized that an offer becomes binding in a unilateral contract when the consideration, the act or forbearance given in exchange, is performed. But what is given must be that which is asked. As we stated in Suske v. Straka, 229 Minn. 408, 414, 39 N. W. (2d) 745, 750:

"The consideration for a promise, whether it be some benefit accruing to one party or some detriment suffered by the other * * * or something else * * * must be something which both parties to the contract have adopted and regarded as such."

In Stern v. Miner, 239 Wis. 41, 45, 300 N. W. 738, 739, the court said:

"* * * Many things may constitute the consideration for a contract. It is the fact that they are the intended consideration that imports them into a contract."

Here, there is no showing in the evidence that defendant, either through Ekern's speech or exhibit Y or by acts or conduct, manifested an intent to accept any act or forbearance as consideration sufficient to work its policy of no dismissal without cause into a contract.

Plaintiff contends that the offer was a continuing one—ever-present in exhibit Y—and accepted by her daily through the years of devoted service, and the performance of various acts of purchasing insurance, the surplus notes, and approving the pension plan. She asserts that the subsequent practical construction of the policy of no dismissal without cause over the period of time between 1931 and 1954 reinforced the intent to become bound by it.

It is not questioned that defendant consistently followed its policy. However, plaintiff erroneously cites cases dealing with modification and subsequent construction of already existing contracts. The question here is whether there was any contract term at all to the effect that plaintiff would be dismissed only for cause. As regards her, the parties had given no construction. Practical construction is helpful in

resolving ambiguities in a contract, or in determining the meaning given to particular words or concepts. City of South St. Paul v. Northern States Power Co. 189 Minn. 26, 248 N. W. 288; Wallace v. Joseph Dixon Crucible Co. 223 Minn. 162, 25 N. W. (2d) 465; Mueller v. Chicago & N. W. Ry. Co. 194 Minn. 83, 259 N. W. 798.

However, following a statement of intention with consistency is not a substitute for contractual relationship. The fallacy in plaintiff's argument lies at its very foundation. Numerous authorities are called upon to buttress plaintiff's contentions about subsequent meaning and construction of contractual terms. However, where the basic essentials of the kind of contract claimed are lacking there is nothing to interpret. Plaintiff has failed to show that her employment contract, "You work for us and we will pay you," terminable at will, was ever changed into one of "You work for us and we will pay you and not dismiss you without cause."

This is not to say that such a contract would be unenforceable. Dismissal for cause is a frequent provision of union contracts. It is not invalid for indefiniteness, as is a "lifetime" contract such as we examined in Skagerberg v. Blandin Paper Co. *supra,* and Degen v. Investors Diversified Services, Inc. 260 Minn. 424, 110 N. W. (2d) 863.

Nor should we be misconstrued as saying that, if there had been such a contract as plaintiff claims, she would not have had job security guaranteed until the minimum retirement age provided by the retirement plan.

We are merely concerned here with a provision allegedly protecting plaintiff against dismissal without cause. There might be any number of valid causes assignable for dismissal, and the length of employment does not enter into the question here. While there is ample evidence to sustain a finding that plaintiff was dismissed without legal cause, no cause of action therefor can exist unless there is a preexisting contractual protection against such action. When all ramifications of the testimony favorable to plaintiff are considered, there exists much too nebulous and feeble a basis upon which to rest such a significant limitation on defendant's discretionary authority to dismiss employees inherent in the kind of contract claimed by plaintiff.

As we have concluded that there was insufficient evidence to prove the existence of such a contract as here claimed, we must uphold the lower court's order granting judgment notwithstanding the verdict. In view of this holding, it becomes unnecessary to consider other assigned errors or questions of appealability of the order granting a new trial.

Affirmed.