The **UNIVERSITY OF MINNESOTA** and the Board of Regents, et al., Appellants,

v.

**Richard J. GOODKIND, D.M.D., M.S., Respondent.**

No. C3–86–1172.

Court of Appeals of Minnesota.

Jan. 20, 1987.

Review Granted March 25, 1987.

William P. Donohue, University of Minnesota, Minneapolis, for appellants.

Stephen M. Goldfarb, George Roberts, Stephen Goldfarb, P.A., Minneapolis, for respondent.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

LANSING, Judge.

The University of Minnesota appeals from an order granting summary judgment to a tenured professor on a breach of contract claim. The University contends the trial court erred in incorporating the Dental School Constitution into the employment agreement, erred in refusing to incorporate the Dental School Administrative Policy 15 (hiring policy), and improperly directed the University to appoint the professor chair of the Department of Fixed Prosthodontics. We affirm, as modified, the trial court's award of summary judgment to the professor.

## FACTS

Dr. Richard Goodkind has been a faculty member of the University of Minnesota School of Dentistry since 1966. He is cur-

rently a member of the Department of Removable Prosthodontics. In September 1982 the Dean of the Dental School, Dr. Richard Oliver, appointed a search committee to screen and recommend candidates for the position of chairperson of the Department of Fixed Prosthodontics. That position was to be vacant due to retirement at the end of the 1982–83 academic year. Dr. Goodkind applied for the position. In May 1983 the search committee recommended Dr. Goodkind as the only candidate. Between May and September 1983, Dean Oliver decided not to recommend Goodkind to the president of the University. Dean Oliver listed four reasons for his decision:

1. Dr. Goodkind had limited experience in teaching prosthodontics to predoctoral students.

2. There were differences in educational goals between Drs. Oliver and Goodkind with respect to the predoctoral program in Fixed Prosthodontics and the assessment of the relative capabilities of predoctoral students and graduate dentists.

3. Dr. Goodkind lacked administrative experience in budget and personnel management.

4. Dr. Oliver had significant doubt that he and Dr. Goodkind could work together smoothly and constructively.

Dean Oliver then appointed Dr. Harvey Colman as "acting" department chairperson. Dr. Colman had been an applicant for the position, but his application was rejected by the screening committee. Although Dr. Colman's appointment was temporary, it was not until early 1985 that Dean Oliver appointed another search committee to screen candidates for the permanent appointment.[1]

In September 1983 Dr. Goodkind filed a formal grievance with the dental school. The grievance was referred to the Academic Freedom and Responsibility Appeals Committee of the University. The committee reviewed the complaint and concluded that it did not have jurisdiction to hear it. Dr. Goodkind then filed suit in federal court in January 1984 (*Goodkind v. University of Minnesota, et al.*, Civ. No. 3–84–15). In January 1985 the federal district court dismissed Dr. Goodkind's breach of contract suit, without prejudice, for lack of jurisdiction.

Goodkind then filed this suit in January 1985 in Hennepin County District Court. The University moved for summary judgment in August 1985. That motion was denied in October 1985. A settlement conference was scheduled for November and later continued to December 1985. The conference was unsuccessful, and both parties subsequently filed motions for summary judgment. Those motions were heard and judgment entered in favor of Goodkind in June 1986.

The district court found that the language of the Dental School Constitution met the unilateral contract formation criteria set out by the Minnesota Supreme Court in *Pine River v. Mettille*, 333 N.W.2d 622 (Minn.1983). The constitution contained specific procedures for hiring department chairpersons which the court found "directly related to plaintiff's employment as professor in the Dental School." Specifically, the constitution directed that "heads or chairpersons of a department *shall* be selected" (emphasis supplied) from those recommended by the search committee. The court found that by failing to appoint Dr. Goodkind, the only person recommended by the search committee, Dean Oliver (and the University) breached this contract.

The court rejected the University's claim that Administrative Policy 15 also applied to the employment contract. That policy provides, "[i]n the event that the Dean does not find the recommended candidates acceptable, a request may be made that the search be broadened or extended, or that a new search committee be appointed." The policy also provides that temporary appointments may be made by the Dean for one, two, or three years following the rec-

---

1. The University did not dispute this date either in the reply brief or at oral argument.

ommendations of a search committee, but "[i]n no case shall such a position be filled for more than one (1) year without filing a hiring plan and conducting the required search for the position."

The trial court granted summary judgment in favor of Dr. Goodkind. It also awarded him back pay based on the augmentation he would have received as department chair and ordered the University to appoint him chair of the Department of Fixed Prosthodontics.

### ISSUES

1. Did the trial court err in including the Dental School Constitution and excluding Administrative Policy 15 as part of Dr. Goodkind's contract with the University?

2. Did the trial court err in finding the University breached its contract with Dr. Goodkind?

3. What is the appropriate remedy for Dr. Goodkind?

### ANALYSIS

#### I

Dr. Goodkind is a tenured faculty member at the University of Minnesota. As a tenured faculty member, he has a contract with the University which is governed by the tenure code. The University characterizes this contract as a written bilateral document. However, they also acknowledge that it does not contain all of the conditions which make up the employment agreement.[2]

Courts have recognized that where faculty tenure agreements do not set forth the full terms and conditions of employment, employment policies, rules and regulations of the college or university become part of the employment contract between the college and the faculty member. *See Brady v. Board of Trustees of the Nebraska State Colleges,* 196 Neb. 226, 242 N.W.2d 616 (1976). Similarly, a university policy of

nondiscrimination has been found to be a part of the contract between a professor and a university. *Adler v. John Carroll University,* 549 F.Supp. 652, 654 (N.D.Ohio 1982). And, "a university's policies, rules and regulations relating to faculty members are a part of the employment contract, as a matter of law." *Rehor v. Case Western Reserve University,* 43 Ohio St.2d 224, 228–30, 331 N.E.2d 416, 420–22 (1975). *See also Zimmerman v. Minot State College,* 198 N.W.2d 108 (N.D.1972) (Higher Education Board policy statement was part of instructor's contract); *Collins v. Parsons College,* 203 N.W.2d 594 (Iowa 1973) ("Tenured teachers in institutions of higher learning have permanent positions as spelled out in the bylaws of their institutions, just as civil servants have permanent positions as spelled out in statutes."); *Greene v. Howard University,* 412 F.2d 1128, 134 U.S.App.D.C. 81 (D.C.Cir.1969) (customary practices may become contractual obligations between university and faculty).

■ The process by which the policies, rules and regulations are incorporated in the employment agreement is similar to the basic legal principles of contract formation and modification. *See* Restatement (Second) of Contracts, § 24; *Day v. Amax, Inc.,* 701 F.2d 1258, 1263 (8th Cir.1983) (interpreting Minnesota law on implied offer of contract modification). The trial court found the principles in *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983), to control Dr. Goodkind's employment relationship with the University. *Pine River* is factually dissimilar in that it dealt with the discharge procedure in an employment manual given to an at-will employee. However, *Pine River* does create a structure for applying contract modification principles which can be applied in analyzing the effect of the Dental School Constitution and Administrative Policy 15 on Dr. Goodkind's employment agreement.

---

**2.** On its face, the tenure code applicable at the time this case arose does not claim to be a comprehensive document. During oral argument, the University admitted that the contract of a faculty member includes such items as fringe benefits. The tenure code does not address fringe benefits.

■ The constitution was approved by the Board of Regents in June 1979. It sets forth the purpose and powers of the Dental School. It also established the authority, duties and responsibilities of the Dean, the faculty and the various departments and councils of the Dental School.

Administrative Policy 15 was adopted by the Dental School Council on Administration in August 1980 to comply with the Rajender Consent Decree. The Rajender Consent Decree was entered in federal court in 1980 as the result of a discrimination in hiring suit. Under the settlement agreement, each department of the University promulgated a policy which would ensure faculty and staff hiring practices which would not discriminate against women. However, the policy is acknowledged not only to prevent discrimination, but as the general hiring policy for the University. Administrative Policy 15 is the hiring policy for the Dental School.

*Pine River* establishes a four-part test for formation of a contract by terms arising after employment has begun: The terms must be (a) definite in form, (b) communicated to the offeree, (c) accepted by the offeree, and (d) enforceable by reason of adequate consideration.

(a) *Definite in Form*

The University claims that both the language and the stated intent of the constitution make it merely a general policy statement which is not sufficiently specific for contract language. Goodkind claims the applicable sections are very specific:

Article VI, Section G:

Recommendations for candidates to be Head(s) or Chairperson(s) of a Department shall be made to the President of the University by the Dean. *The candidates shall be selected from among those recommended by a Search Committee appointed by the Dean.*

Article II, Section B:

The Dean shall have the final authority to make recommendations to the President on appointment * * * of Head(s) or Chairperson(s) of Departments *following*

*duly constituted consultative procedures in the School.*

Adding the emphasis noted above, the trial court declared the language to be specific enough to be part of a contract.

We agree. The quoted language has specificity similar to the handbook language in *Pine River.*

The trial court, however, did not analyze Administrative Policy 15 according to the *Pine River* criteria. Administrative Policy 15 states: "In the event that the Dean does not find the recommended candidates acceptable, a request may be made that the search be broadened or extended, or that a new search committee be appointed." The language in Administrative Policy 15 is equally specific and sufficiently clear to be considered contract language.

(b) *Communicated to the Offeree*

It is undisputed that the constitution was disseminated to the Dental School faculty and that Administrative Policy 15 was disseminated in the same manner as the constitution. In fact, the Rajender Consent Decree generated a number of workshops to explain its effects and the new hiring policies at the University.

In *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 117 N.W.2d 213 (1962), the court found that an employment policy which was recorded by the personnel director and not given to new employees was not sufficiently disseminated to be a contract. The sole copy of the written policy was kept by the personnel director and was intended to be used only as a guide for supervisory personnel. *Id.* at 534, 117 N.W.2d at 222. The Dental School Constitution, on the other hand, governed both faculty and administration actions. There was more than one copy. Dean Oliver admits that the constitution is available in the Dean's office and every departmental office. Although it is not regularly passed out to every faculty member, it is available for viewing. The dissemination patterns in this case lie somewhere between the individual distribution of documents in *Pine River* and the unseen single copy of a policy in *Cederstrand.* Be-

cause of the accessibility of both documents to all faculty and the workshops on new University hiring policies, we believe that the dissemination was more like that of *Pine River* than *Cederstrand.*

(c) *Accepted by the Offeree*

(d) *Enforceable by Consideration*

*Pine River* found acceptance in "[t]he employee's retention of employment * * * [B]y continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer." *Pine River*, 333 N.W.2d at 627. The University concedes that if the constitution and Policy 15 are a contract, then Goodkind has furnished consideration by continuing his employment for several years after they were adopted. We agree.

We are satisfied that the Dental School Constitution and Administrative Policy 15 are part of Dr. Goodkind's employment contract with the University.[3]

## II

### *Breach of Employment Contract*

■ The trial court found that a breach of Dr. Goodkind's employment agreement occurred when the University failed to appoint him as the only person recommended by the search committee to the chair of the Fixed Prosthodontics Department. The court reached this determination by applying only the provisions of the Dental School Constitution. Because we conclude that Administrative Policy 15 is also a part of Goodkind's employment agreement, the provision on appointment of individuals recommended by the search committee is subject to some latitude, rather than the absolute terms contained in the Dental School Constitution.

We do not see the provisions of Administrative Policy 15 as conflicting with the constitution. The two documents can be read to be consistent with each other. *See Burgi v. Eckes*, 354 N.W.2d 514 (Minn.Ct. App.1984); *Anderson v. Kammeier*, 262 N.W.2d 366 (Minn.1978). Although only qualified candidates recommended by the search committee can be appointed, if the dean does not find the recommended candidates acceptable, a request may be made that the search be broadened or extended, or that a new search committee be appointed. However, even with this additional latitude, the undisputed evidence shows that the agreement was breached.[4]

Although the policy allows temporary appointments for one, two, or three years following the recommendations of a search committee, in no case can a position be filled by a temporary appointment for more than one year without filing a hiring plan and conducting the required search for the position. The policy allows two exceptions to the search committee for visiting professors and unexpected vacancies, neither of which apply here.

When Dean Oliver decided not to recommend Dr. Goodkind, he appointed Dr. Colman as acting chair of the department. Dean Oliver did not appoint another search committee until 1985. Dean Oliver's failure to nominate a candidate recommended by the search committee, in the absence of an unexpected vacancy, violated Goodkind's contract with the University.

## III

### *Appointment and Compensatory Damages*

■ The appropriate remedy for the University's breach of Dr. Goodkind's employment agreement is not easily determined.

---

3. It should also be noted that Policy 15 was promulgated in compliance with the Rajender Consent Decree. As a party to that consent decree, the University is bound to abide by its terms. The consent decree also binds employees of the University.

4. Both parties acknowledge that Goodkind was the sole recommendation of the search committee, which explicitly rejected the application of Dr. Colman. According to Goodkind's brief, Colman was appointed acting chair in September 1983 and has continuously held that position to the present. Not until early 1985 was a new search committee appointed. The University has not disputed these facts.

The trial court ordered that Goodkind be appointed to the position he sought and that he receive damages in the amount of the augmentation he would have received had he been appointed at the time he was recommended.

Courts in other jurisdictions have at times refused to order reinstatement of faculty members in cases where plaintiffs have claimed violations of university policies. *See Smith v. University of North Carolina*, 632 F.2d 316 (4th Cir.1980); *Lieberman v. Gant*, 630 F.2d 60 (2d Cir.1980); *Keyes v. Lenoir Rhyne College*, 552 F.2d 579 (4th Cir.1977). Courts have also ordered either reinstatement to a previous position or appointment to the next available position for which the applicant is qualified when faculty members have been dismissed in contravention of contracts, rules and regulations of universities. *See Hooper v. Jensen*, 328 S.E.2d 519 (W.Va. 1985); *Owen v. Rutledge*, 475 So.2d 826 (Ala.1985); *University of Alaska v. Geistauts*, 666 P.2d 424 (Alaska 1983); *Rutherford v. State Personnel Board*, 101 Cal. App.3d 1, 161 Cal.Rptr. 287 (1980); *Ofsevit v. Trustees of California State University and Colleges*, 21 Cal.3d 763, 148 Cal.Rptr. 1, 582 P.2d 88 (1978).

We cannot find that Dr. Goodkind is absolutely entitled to appointment. We note that he is a candidate in the renewed search and may be successful. However, we cannot overlook the fact that from September 1983 to the present Dr. Goodkind is the only person who was eligible for a term of more than one year. He was the only candidate recommended by the search committee. Because he is the only candidate who could fill the position and because the University's actions in not following their own regulations and policies prevented him from assuming this position, we believe that he is entitled to augmentation damages from July 1983 to the present, and affirm the trial court's award of damages.

*Attorney's Fees and Punitive Damages*

■ Absent specific contractual or statutory authority, attorney's fees may not be awarded to a prevailing litigant. *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 53 (Minn.1983). Goodkind requests attorney's fees under Minn.Stat. § 549.21 (1982). Although Dr. Goodkind has shouldered the burden of litigation to force the University to follow its own policies, we affirm the trial court's denial of attorney's fees because we do not find that the University or its attorney acted in bad faith, asserted a frivolous claim, delayed proceedings or committed a fraud upon the court.

■ Similarly, we find no basis for punitive damages under Minn.Stat. § 549.20 (1982). A plaintiff seeking to recover damages for breach of contract is limited to damages flowing from defendant's breach. *Eklund v. Vincent Brass and Aluminum Co.*, 351 N.W.2d 371, 379 (Minn.Ct.App. 1984).

**DECISION**

Affirmed.