RUTCHER SKAGERBERG v. BLANDIN PAPER COMPANY.[1]

May 1, 1936.

No. 30,883.

*George W. Peterson, Joseph F. Cowern,* and *Charles E. Carlson,* for appellant.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendant's general demurrer to plaintiff's amended complaint was sustained, and plaintiff appeals.

[1]Reported in 266 N. W. 872.

The challenged pleading is somewhat lengthy. The following summary, however, is deemed sufficient to provide a basis for discussion of the controlling issues.

Plaintiff is a consulting engineer, a specialist in the field of heating, ventilating, and air conditioning. As such he had developed a clientele bringing him a weekly income of approximately $200.

Defendant operates a paper manufacturing plant at Grand Rapids, this state. It had employed plaintiff in his professional capacity in 1926 and again in 1930. He was paid at the rate of $200 per week while so employed. Defendant was planning extensive enlargements of its plant, the estimated expense being about $1,000,000. Ordinarily a consulting engineer's fees for doing the necessary planning and supervision of the contemplated improvements would involve from $35,000 to $50,000. During plaintiff's employment in 1930 there was some discussion between the parties with respect of plaintiff's employment to take this work in hand. At that time, too, he was negotiating with the executive officers of Purdue University relative to taking a position as associate professor in its department of engineering, particularly that branch thereof relating to heating, ventilating, and air conditioning.

The Purdue position carried a salary of $3,300 per year and required only nine months' work in the way of instructions. This would leave plaintiff free to continue his practice as a consulting engineer during a period of three months of each calendar year. He was also privileged, if he entered that position, to continue his practice as a consulting engineer at all times insofar as his professional work at the university permitted him so to do. In addition thereto, he was privileged to contribute to engineering magazines and other publications. All income from such outside engagements was to be his in addition to the stated salary. Plaintiff considered this opportunity as one especially attractive to him. Defendant had full knowledge of all the foregoing facts.

On October 13, 1930, plaintiff, having received a telegram from Purdue University offering him the position and requiring immediate acceptance or rejection thereof, at once called an officer of defendant over the long-distance telephone informing him of the offer and

the necessity on his part of making immediate response thereto. Defendant's officer agreed that if plaintiff would reject the Purdue offer and also agree to purchase the home of defendant's power superintendent it would give plaintiff permanent employment at a salary of $600 per month. Relying thereon, plaintiff rejected the Purdue offer and immediately thereafter moved to Grand Rapids and there entered upon the performance of his duties under this arrangement. He later entered into a contract for the purchase of the superintendent's home. Appropriate to note is the fact that these negotiations were entirely oral and over the long-distance telephone, plaintiff being at Minneapolis and defendant's officer at Grand Rapids. The only writing between the parties is a letter written on October 14, 1930, reading thus:

"Blandin Paper Co.
"Grand Rapids, Minn.
    "Attention:   Mr. C. K. Andrews
"Gentlemen:

"In accordance with our conversation yesterday when our agreement was settled regarding my position with your company, I have wired Purdue rejecting their offer. Under the circumstances it was impossible for us to get together on a written agreement; I had to wire Purdue at once. However, I am making this move on the assumption that there will be no difficulty in working out our agreement when I get up to Grand Rapids.

"Propositions like the one Purdue made are very rare and I am turning it down since I feel that the opportunities with you for applying my past experience are very attractive, the essential consideration being, however, that the job will be a permanent one.

"According to the understanding we have, I am to take over Mr. Kull's duties as Power Superintendent and serve also as Mechanical Engineer for your plant, supervising the mechanical construction and maintenance work and other mechanical technical matters. Mr. Kull is to remain for long enough period, about six months, to permit me to get my work organized and get acquainted with the details of his work. If the proposed new construction work is

started within that time it may develop that Mr. Kull may remain until that is completed after which he will leave and I take over his duties. As an accommodation to him when he leaves town I am to purchase his house.

"My salary is to be six hundred dollars ($600.00) per month and you are to pay my moving expenses to Grand Rapids.

"Very truly yours,

"RS/m                                                    R. Skagerberg."

Plaintiff rendered the services for which he was thus engaged "dutifully, faithfully and to the complete satisfaction of the defendant and was paid the agreed salary, except as to a voluntary reduction, up to September 1, 1932," when, so the complaint alleges, he was "wrongfully, unlawfully and wilfully" discharged from further employment, although "ready, willing and able to perform." By reason of the alleged breach of contract he claims to have suffered general damages in the amount of $25,000, and for this he prays judgment.

From what has been stated it is clear that the issue raised by the demurrer is simply this: Do the allegations set forth in the complaint show anything more than employment of plaintiff by defendant subject to termination at the will of either party?

■ The words "permanent employment" have a well established meaning in the law. The general rule is well stated in 18 R. C. L. p. 509, § 20:

"In case the parties to a contract of service expressly agree that the employment shall be 'permanent' the law implies, not that the engagement shall be continuous or for any definite period, but that the term being indefinite the hiring is merely at will."

To the same effect is the statement of the rule in 35 A. L. R. 1432:

"In most of the jurisdictions passing on the duration of a contract purporting to be for permanent employment, it is held that, in the absence of additional express or implied stipulation as to the duration of the employment or of a good consideration additional to the services contracted to be rendered, a contract for permanent employment, for life employment, for as long as the employe chooses,

or for other terms purporting permanent employment, is no more than an indefinite general hiring terminable at the will of either party."

Numerous cases are cited under both texts. See also 3 Wd. & Phr. (4 ser.) p. 71, and cases there cited.

Counsel for both parties are in complete accord that the general rule is as stated in the cited authorities.

■ The difficult question presented is whether the allegations set forth in the complaint bring this case within an exception to the rule stated. We find in 18 R. C. L. p. 510, the following statement:

"Under some circumstances, however, 'permanent' employment will be held to contemplate a continuous engagement to endure as long as the employer shall be engaged in business and have work for the employe to do and the latter shall perform the service satisfactorily. This seems to be the established rule in case the employe purchases the employment with a valuable consideration outside the services which he renders from day to day."

And in 35 A. L. R. 1434, it is said:

"It has been held that where an employe has given a good consideration in addition to his services, an agreement to hire him permanently should, in the absence of other terms or circumstances to the contrary, continue so long as the employe is able and willing to do his work satisfactorily."

Many cases are cited under the respective texts to sustain the language quoted.

Plaintiff cites and relies upon Carnig v. Carr, 167 Mass. 544, 46 N. E. 117, 35 L. R. A. 512, 57 A. S. R. 488; Roxana Petroleum Co. v. Rice, 109 Okl. 161, 235 P. 502, 503; Pierce v. Tennessee C. I. & R. Co. 173 U. S. 1, 19 S. Ct. 335, 43 L. ed. 591, and other cases of similar import. A brief discussion of the cited cases upon which plaintiff relies may be helpful.

In Carnig v. Carr, 167 Mass. 544, 46 N. E. 117, 35 L. R. A. 512, 57 A. S. R. 488, plaintiff had been engaged in business for himself as an enameler. Defendant was a business competitor. Being

such, and for his own advantage, defendant persuaded plaintiff to give up his business and sell his stock in trade to him. As consideration, in part at least, for entering into this arrangement, defendant agreed to employ plaintiff permanently at a stated salary, his work for defendant being the same as that in which plaintiff had been engaged. It is clear that what defendant sought and accomplished was to get rid of his competitor in business upon a promise on his part to give plaintiff permanent employment. The resulting situation amounted to the same thing in substance and effect as if plaintiff had purchased his job. Under such circumstances there can be no doubt that the exception to the general rule was properly invoked and applied and furnishes an illustration thereof. (Compare Campion v. B. & M. R. Co. 269 Mass. 579, 169 N. E. 499.)

In Pierce v. Tennessee C. I. & R. Co. 173 U. S. 1, 19 S. Ct. 335, 43 L. ed. 591, plaintiff had received an injury while employed by defendant. To settle the difficulty defendant promised employment to plaintiff at certain stated wages and was also to furnish certain supplies as long as his disability to do full work continued by reason of his injury. In consideration for these promises plaintiff released the company from all liability for damages on account of the injuries which caused his disability. Here, too, it is clear that plaintiff purchased from defendant his employment. There are many such cases. Only a few need be cited. See Pennsylvania Co. v. Dolan, 6 Ind. App. 109, 32 N. E. 806, 51 A. S. R. 289; Harrington v. Kansas City C. Ry. Co. 60 Mo. App. 223; Kelly v. Peter & Burghard S. Co. 130 Ky. 530, 113 S. W. 486; Louisville & N. R. Co. v. Cox, 145 Ky. 667, 141 S. W. 389; Daniell v. B. & M. R. Co. 184 Mass. 337, 68 N. E. 337, and St. Louis, I. M. & S. Ry. Co. v. Morgan, 107 Ark. 202, 154 S. W. 518.

In Roxana Petroleum Co. v. Rice, 109 Okl. 161, 235 P. 502, plaintiffs Rice and Lyons were attorneys and rendered professional services for defendant over a period of time. They had other clients who paid them large annual retainers, one of these being the Pierce Oil Company, from which client they received an annual retainer of $17,500. The attorneys were prevailed upon by defendant to

sever their connections with other clients and were promised and paid an annual retainer of $15,000, later increased to $20,000. Some time thereafter the petroleum company claimed that the expense bills were unsatisfactory. A controversy arose, and to settle same a compromise agreement was made. "In this [compromise] agreement a new [employment] contract was made  *  *  *." [109 Okl. 162.] The general offices of the company had been moved to St. Louis. Plaintiffs were to continue their services in representing defendant in 40 or 50 lawsuits that were then pending in the courts of Oklahoma and Texas, and they were to continue in the services of the company in these two states as long as the defendant operated therein and as long as the services of the plaintiffs were satisfactory, and pay them reasonable fees for legal as well as other services. Later on new difficulties arose respecting the new contract. The court in distinguishing this form of contract from the ordinary contract of permanent employment came to the conclusion that because plaintiffs had compromised their claims against the company, changed their position in relation to their general practice, incurred expenses in maintaining an office for the special services of defendant, that thereby there was a permanent contract of employment. The court said (109 Okl. 165) :

"We are of the opinion that from the facts and circumstances attending the making of the contract of employment in the instant case it was the intention of the parties that the employment was to continue as long as the defendant was in business in Oklahoma and Texas, and the plaintiffs were not subject to discharge without cause."

With regard to that part of the new agreement which provided that plaintiffs were to be paid as long as their services were "satisfactory" to defendant, the facts were such as to justify the court in holding that defendant's claimed dissatisfaction was not genuine but rather and only pretended. The court quoted with approval the following statement from Electric Lighting Co. v. Elder Bros. 115 Ala. 138, 21 So. 983 [109 Okl. 165] :

"But the dissatisfaction must be in good faith and with the performance of the contract.  *  *  *  A plea of dissatisfaction with

the work agreed to be satisfactorily completed must allege the facts from which the dissatisfaction arises. * * * He must be in good faith dissatisfied. He cannot avoid liability by merely alleging that he is dissatisfied. * * * The dissatisfaction must not be capricious nor mercenary nor result from a design to be dissatisfied. It must exist as a fact. It must be actual, not feigned; real, not merely a pretext to escape liability."

That the court did not intend to go beyond the general rule pertaining to such form of contract is clearly shown by the subsequent opinion rendered in Dunn v. Birmingham S. & R. Co. 170 Okl. 452, 44 P. (2d) 88, where plaintiff was hired as defendant's exclusive agent for the sale of its products in Tulsa, no time limit as to term of service having been provided for in the agreement. Five months later defendant, without notice to plaintiff, began selling its products to other retailers in Tulsa. Judgment for plaintiff in nominal damages only was sustained on appeal.

This court has had occasion to pass upon similar questions in various cases. Thus in Horn v. Western Land Assn. 22 Minn. 233, 236, plaintiff had been appointed as attorney for defendant "at a salary of $1,000 per year, payable quarterly," and was so informed in writing. Plaintiff wrote a letter "accepting the appointment upon the terms offered." The court determined that this constituted a contract as to which neither party, without the other's consent, could lawfully rescind without cause during the year.

In Bolles v. Sachs, 37 Minn. 315, 33 N. W. 862, two written agreements were involved, neither showing upon its face mutuality of obligation or other consideration. The court held that the two instruments could be considered together so as to show that one was given in consideration for the other. As thus construed the contract amounted to one of employment providing in substance that plaintiff was to render services for defendant as long as he might elect to serve. The employer breached the contract and sued for damages. The court held that the employe, never having fixed by his election the period of service, could not recover substantial damages, the obligation violated being too uncertain to furnish a basis for assessment of substantial damages.

In Smith v. St. Paul & D. R. Co. 60 Minn. 330, 332, 62 N. W. 392, 393, plaintiff had been injured in the line of his employment. In settlement of the injury he was promised employment. In respect of the validity of such contract the court said:

"The consideration for defendant's agreement to employ was paid by the release of plaintiff's claim for damages quite as much and as effectually as if plaintiff had actually paid cash. By releasing his claim for damages, the plaintiff paid in advance for the privilege or option of working for the defendant; and, having done this, he had the right to have it remain optional with him how long he would continue to work for the company, while it remained obligatory upon the latter to furnish the opportunity so long as he chose to work, and was able to properly perform the same. The plaintiff had parted with value for the optional contract, and there was owing to him a reciprocal duty and obligation on the part of the company. Pennsylvania Co. v. Dolan, 6 Ind. App. 109, 32 N. E. 802, 51 A. S. R. 289."

In McMullan v. Dickinson Co. 60 Minn. 156, 62 N. W. 120, 27 L. R. A. 409, 51 A. S. R. 511, and the same case on the second appeal, 63 Minn. 405, 65 N. W. 661, 663, the first syllabus paragraph of the second opinion reads:

"Plaintiff and defendant, a corporation, entered into an agreement by the terms of which the latter employed the former as assistant manager upon a stated yearly salary, payable in monthly instalments, said employment to continue so long as the business of the corporation should be continued, provided plaintiff properly and efficiently discharged his duties, and only so long as he should own and hold in his own name 50 shares of capital stock, fully paid up, in defendant corporation. *Held*, that the period of employment was for such time as plaintiff continued to own and hold the stock shares, not exceeding the period during which the corporate business was being transacted, and was fixed with sufficient definiteness; and, further, that there was no lack of mutuality of consideration."

In Newhall v. Journal Printing Co. 105 Minn. 44, 117 N. W. 228, 20 L.R.A. (N.S.) 899, action was brought upon a written contract. Plaintiff's assignor, in consideration of $135 paid to defendant, was by the latter given the exclusive right to sell its publications within certain specified territory. Provision was made in the contract that either party thereto might terminate the same upon 30 days' written notice to the other. Upon the expiration of the 30-day period from the date of service of such notice [105 Minn. 45] "all the rights of said second party [plaintiff] under said contract shall cease, except the right of reimbursement as hereinafter provided; provided, however, that said first party [defendant] shall not terminate this contract, except for the dishonesty, incompetence, negligence, inattention, or irresponsibility of said second party." The court held upon plaintiff's action to recover damages for its breach that the parties intended (and the contract clearly expressed such intention) that defendant could not terminate the contract "except for the dishonesty, incompetence, negligence, inattention, or irresponsibility" by the other party thereto.

For notes and annotations where the cases may be found, see 35 L. R. A. 512; 35 A. L. R. pp. 1432 and 1434; 62 A. L. R. 234; 20 Minn. L. Rev. 222; Am. Dig. (18 Third Dec. p. 1282) Master and Servant, No. 20.

■ From the cases discussed, and the discussion is limited to but a few of the many available, the rules of law applicable to the facts in the instant case do not seem to be in doubt, nor do we understand that counsel for either side criticize the rules of law laid down in these cases. Division or difference of opinion arises entirely by reason of the difficulty in application of these rules to the facts pleaded.

Plaintiff maintains that four different items of consideration entered into the contract relied upon, in addition to the promised service to be rendered, namely: (1) The rejection of the Purdue offer; (2) the agreement to purchase the superintendent's house; (3) that plaintiff gave up an established business; and (4) that defendant saved the commission that it otherwise would have to pay engineers on new construction work.

Plaintiff obviously could not accept both the Purdue and the defendant's offer. It was for him to take one or the other. He could not possibly serve both masters.

A man capable of earning $600 per month necessarily must be possessed of both learning and experience in his particular line of endeavor. The fact that he was able to command such salary at the time of entering into defendant's service is convincing proof that there must be more than one person or enterprise seeking his talents and services. If plaintiff had elected to go to Purdue and, after having been there employed the same length of time as he was by defendant, was then discharged, does it follow that he could successfully sue Purdue University upon the same theory that he is here making a basis for liability against defendant? We have found no case fitting into plaintiff's claim in this regard.

What has been said in respect of the Purdue opportunity applies with equal force to the third point raised by plaintiff. His capacity as a specialist in his line of endeavor had built up for him a lucrative practice. That practice he could not take with him when he entered defendant's employment. Is not this exactly what every person having any line of employment must do when he seeks and obtains another? If plaintiff had been engaged in the practice of the law and as such had established a clientele bringing the same income and had later taken on a contract to act for a corporate enterprise at a fixed salary of $600 per month upon the same basis as here, do his counsel think, in virtue of the well established rules of applicable law, that he would have a lifetime job? Would not counsel have insisted upon a more definite agreement than that relied upon here?

Plaintiff's claims in this regard are ably discussed and disposed of in Minter v. Tootle, Campbell Dry Goods Co. 187 Mo. App. 16, 27-28, 173 S. W. 4, 8. In that case plaintiff was employed by defendant for a term which plaintiff supposed to be permanent. About two years thereafter he was discharged and brought this action to recover his expenses and unpaid salary. There the employe in order to enter into defendant's employment gave up his other employment.

This was the basis for his theory of the case. The court said [187 Mo. App. 27]:

"The reported cases which deal with contracts of employment in commercial business, where no other consideration than a promise to perform the service passes from the employe to the employer, are almost unanimous in applying the general rule that the words permanent, lasting, constant, or steady, applied to the term of employment do not constitute a contract of employment for life, or for any definite period, and such contracts fall under the rule 'that an indefinite hiring at so much per day, or per month, or per year, is a hiring at will and may be terminated by either party at any time, and no action can be sustained in such case for a wrongful discharge.' * * * The general rule that the assurance of permanent employment will be construed as meaning an indefinite, as distinguished from a special, or merely temporary employment, is a common sense inference founded upon common knowledge of the customs and usages of business. The effort of plaintiff to show an additional consideration passing from him to defendant was abortive since it shows that he merely abandoned other activities and interests to enter into the service of defendant—a thing almost every desirable servant does upon entering a new service, but which, of course, cannot be regarded as constituting any additional consideration to the master."

See also Arentz v. Morse D. D. & R. Co. 249 N. Y. 439, 164 N. E. 342, 62 A. L. R. 231, where many cases are cited supporting the conclusion therein reached.

With regard to purchase of the superintendent's house, note should be made that in plaintiff's letter written the day following the alleged making of the contract he said:

"According to the understanding we have I am to take over Mr. Kull's duties as Power Superintendent and serve also as Mechanical Engineer for your plant, supervising the mechanical construction and maintenance work and other mechanical technical matters. Mr. Kull is to remain for long enough period, about six months, to permit me to get my work organized and get acquainted with the

details of his work. If the proposed new construction work is started within that time it may develop that Mr. Kull may remain until that is completed after which he will leave and I take over his duties.

"As an accommodation to him when he leaves town I am to purchase his house."

It is difficult to find anything in this language indicating a consideration for, going to, or in any way benefiting defendant to induce it to enter into such contract. Plaintiff's own statement is that "as an accommodation to him [Kull] when he leaves town I am to purchase his house." How this could be of any material interest to or concern of defendant in view of plaintiff's own letter and stipulation is not apparent. Nowhere in the complaint is there any allegation that the purchase of the house from the superintendent in any way benefited defendant or damaged plaintiff. A man in plaintiff's position would necessarily be interested in acquiring a place of abode upon leaving Minneapolis for Grand Rapids. In the very nature of his requirements he entered into the purchase for his own use and accommodation rather than for any benefit to or advantage of defendant. Nowhere is there any suggestion that defendant was to furnish him with a place of abode or do anything whatever in respect of finding or providing such.

Lastly, we come to plaintiff's claim that he rendered professional services in the construction work worth much more than his stipulated monthly salary. By referring to his letter it is obvious that that was one of the things he was to take in hand and upon the basis of payment mentioned in the letter. He received that compensation during the time of his employment. He was paid the stipulated price according to his own version of the agreement.

The order sustaining defendant's demurrer is affirmed.