Lowell W. GUNDERSON, Appellant,

v.

**ALLIANCE OF COMPUTER PROFESSIONALS, INC., et al., Respondents.**

No. C1–00–1484.

Court of Appeals of Minnesota.

May 22, 2001.

Review Granted July 24, 2001.

Richard T. Ostlund, Randy G. Gullickson, Lindquist & Vennum P.L.L.P., Minneapolis, for appellant.

Mary A. Rice, Shannon M. McDonough, Fafinski Mark & Johnson, P.A., Eden Prairie, for respondents.

Considered and decided by ANDERSON, P.J., LANSING and HALBROOKS, JJ.

## OPINION

LANSING, Judge

Lowell Gunderson appeals from summary judgment dismissing his action against Alliance of Computer Professionals, Inc. (ACP), and denying his motion for a fair-value buyout. Gunderson's action arises from the termination of his employment with ACP and his involuntary removal as shareholder, officer, and director. Gunderson challenges the dismissal of both his common-law breach-of-employment-contract claim and his claim of unfairly prejudicial conduct under Minn.Stat. § 302A.751, subd. 1(b)(3) (1998).

Because we conclude as a matter of law that Gunderson's employment was at will, we affirm the district court's dismissal of Gunderson's breach-of-employment-contract claim. We also affirm the district court's determination that ACP did not unfairly prejudice Gunderson in his capacity as a shareholder by enforcing the buy-sell agreement to remove him as shareholder and to repurchase his stock or by running the corporation in an unfairly prejudicial manner. But because we conclude that disputed issues of material fact remain on whether ACP unfairly prejudiced Gunderson in his capacity as a shareholder-employee by terminating his

employment, we reverse the dismissal of Gunderson's unfairly-prejudicial-conduct claim and the premature denial of his motion for a fair-value buyout as it relates solely to his reasonable expectations as a shareholder-employee, and we remand.

## FACTS

ACP is a computer-consulting firm founded by Daniel and Sandy Jones in 1994. Shortly after the company was founded, Lowell Gunderson became a shareholder, officer, director, and employee of ACP. Gunderson played a critical role in developing the company. He drafted and filed the articles of incorporation, assumed responsibility for the company's day-to-day operations and financial affairs, and became its marketing director. To get ACP "off and running," he also guaranteed capital purchases, the company's business credit card, a note for equipment, and an operating line of credit. Gunderson received an annual salary and a year-end bonus.

As part of a graduate-school assignment for which he received credit, Gunderson drafted a business plan for ACP. The plan contemplated that Daniel Jones would contribute technical knowledge and a network of computer associates and potential clients to ACP. Gunderson, on the other hand, would contribute administrative and financial services to the company and its consultants and would act as the company's marketing director during the first year of operations. The goal under the plan was to develop name recognition during the first seven years and to sell the company thereafter. But none of the other shareholders or the board of directors ever learned of the business plan.

In early 1996, Bradley Gilbert, Robert Johnson, and Andrew Valles became shareholders and directors of ACP. Hoping that the addition of new shareholders would benefit ACP, Gunderson diluted his 50% interest in the company to allow Gilbert, Johnson, and Valles each to acquire a 10% interest.

In July 1996, ACP hired Sandy Foley to be its marketing director. Both the shareholders and the board participated in the decision to hire Foley. Gunderson voluntarily transferred his recruiting duties to her and became responsible only for managing the company's financial affairs.

Early in 1997, Jones recruited Michael Folken, a personal friend with an excellent track record in marketing and sales, to head the marketing division. The shareholders recognized that ACP was at a plateau and would benefit from Folken's hiring. By a straw vote at an informal meeting, they agreed to hire Folken. Because ACP could not compensate Folken, Jones proposed that Folken join ACP as a shareholder and agreed to transfer 10% of his interest to him. The board agreed.

After Folken was hired, Gunderson, Jones, and Folken met monthly over lunch to discuss operational and financial matters. At these meetings, they often made decisions affecting the corporation. Gunderson and Jones also continued to meet alone to discuss the company.

In June 1997, the board of directors unanimously approved a buy-sell agreement, which all the shareholders signed. Gunderson took an active role in drafting the agreement. He selected the attorney who represented the company and worked from a standard buy-sell agreement the attorney provided. To the standard agreement, Gunderson added a clause permitting the involuntary withdrawal of shareholders by a ¾ vote of the total number of shareholders. Gunderson also proposed a buyout provision under which the value of a withdrawing shareholder's shares would be determined by the length of time the

shareholder had held the shares. If the withdrawing shareholder had held his or her shares less than five years, the value of the shares would be the amount the shareholder paid for the shares plus 5% interest per year. If the shareholder had held his or her shares more than five years, the value of the shares would be the withdrawing shareholder's proportionate share of the corporation's book value as of the end of the preceding fiscal year. The buy-sell agreement gave ACP the first option to purchase a withdrawing shareholder's shares.

In late 1997 or early 1998, Gunderson requested that ACP hire an administrative assistant to assume his daily financial duties so that he could move into recruiting. Pursuant to Gunderson's request, the ACP board hired Barb Prescher in July 1998. After transferring his daily financial responsibilities to Prescher and working with her for three weeks to ease her transition into the company, Gunderson moved into recruiting. Shortly after assuming her duties, Prescher set up lockboxes for company deposits and a computer password for files containing financial information.

In April 1998, Valles resigned his position as secretary, claiming that Folken and Jones had assumed control of the corporation and were acting without board approval and in disregard of board decisions. In August 1998, Jones approached Valles to begin discussions about Valles's departure from ACP. Shortly after, Valles and Jones reached a tentative termination agreement, which Jones presented to the board for approval. Pursuant to the agreement, ACP paid Valles $20,000 for his stock and as severance.

In October 1998, Jones asked Gunderson to leave ACP. Jones claimed that Gunderson's departure was in the corporation's best interests because Gunderson was dis-honest, worked short and unpredictable hours, failed to produce qualified recruits, failed to draw the corporation's bylaws, was often late for meetings, refused to move his office from home to ACP, and spent too much time working on business related to Gunderson & Associates, his own consulting firm. After being asked to leave, Gunderson secretly copied company files containing financial information. In early November, the board voted to terminate Gunderson as an employee and to remove him as shareholder, director, and officer.

Relying on the valuation provision of the buy-sell agreement, the board offered Gunderson $2,300 for his stock. Gunderson's appraiser valued the company as of December 31, 1998 at $5,100,000 and Gunderson's ownership interest at $1,133,000. ACP's appraiser valued the company at $1,700,000 and Gunderson's interest at $175,000 after applying a minority discount. Gunderson declined the board's repurchase offer.

In January 1999, Gunderson brought this action against ACP, seeking "compensatory, consequential, special, liquidated, and/or punitive damages and other relief" under the Minnesota Business Corporation Act and "factually related common-law claims." ACP moved for summary judgment, and Gunderson moved for a fair-value buyout under Minn.Stat. § 302A.751, subd. 2 (1998). The court granted summary judgment in ACP's favor and denied Gunderson's motion for a court-ordered buyout. In granting summary judgment, the court reasoned that Jones's alleged assurance that Gunderson "would always be taken care of" and Folken's alleged exhortation to "stick with me and I will make you rich when we sell the company" provided an inadequate factual basis for a breach-of-employment-contract claim. The court also concluded that Gunderson's

remaining claims were unsupported by fact or law. In denying Gunderson's motion for a fair-value buyout, the court concluded that the buy-sell agreement was reasonable and, therefore, binding. This appeal followed.

## ISSUES

I. As a matter of law, did ACP breach an oral contract of continuing employment by terminating Gunderson's employment?

II. As a matter of law, did ACP act in a manner unfairly prejudicial toward Gunderson in his capacity as a shareholder, in violation of Minn. Stat. § 302A.751, subd. 1(b)(3) (1998), by enforcing the parties' buy-sell agreement to remove Gunderson as a shareholder and to repurchase his stock at less than its fair market value or by otherwise operating the corporation in a manner unfairly prejudicial to him?

III. Do genuine issues of material fact remain on whether, by terminating Gunderson's employment, ACP acted in a manner unfairly prejudicial toward him in his capacity as a shareholder-employee in violation of Minn.Stat. § 302A.751, subd. 1(b)(3)?

## ANALYSIS

■ On appeal from a district court's grant of summary judgment, we consider whether genuine issues of material fact remain for trial and whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). In so doing, we view the evidence in the light most favorable to the party against whom judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993).

**I**

*Common Law Claim for Breach of Employment Contract*

Gunderson first argues the district court erred in dismissing his breach-of-employment-contract claim on summary judgment because genuine issues of material fact remain on whether Jones's and Folken's assurances of job security resulted in an oral agreement that, absent just cause for dismissal, Gunderson's employment would continue as long as he remained a shareholder or until the corporation was sold. We disagree.

■ In the absence of an express or implied agreement to the contrary or sufficient consideration in addition to the services to be rendered, Minnesota law presumes that employment for an indefinite term is at will. *Skagerberg v. Blandin Paper Co.*, 197 Minn. 291, 294–95, 266 N.W. 872, 874 (1936); *Aberman v. Malden Mills Indus., Inc.*, 414 N.W.2d 769, 771 (Minn.App.1987) (stating that "[u]nless otherwise agreed between the parties, the employment relationship is at will"). Even a contract for permanent employment is presumed to be for an indefinite term at will, absent an express or implied stipulation of duration. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 628 (Minn.1983); *Aberman*, 414 N.W.2d at 771. The at-will doctrine "allows an employer to terminate an employee with or without just cause in the absence of an agreement limiting the employee's discharge to just cause or specifying the term of employment." Sandra L. Schlafge, Comment, *Pedro v. Pedro: Consequences for Closely Held Corporations and the At Will Doctrine in Minnesota*, 76 Minn. L.Rev. 1071, 1081 (1992) (footnotes omitted).

■ To overcome the presumption that employment is at will, an employee

must present objective evidence that the employer clearly intended to create a lifetime-employment contract. *Aberman,* 414 N.W.2d at 771. Typically, an employee must establish clear and unequivocal language by the employer evidencing an intent to provide job security. *See, e.g., Degen v. Investors Diversified Servs., Inc.,* 260 Minn. 424, 428, 110 N.W.2d 863, 866 (1961) (concluding that employer's statement that employee should consider his job "a career situation" fell "far short of establishing a lifetime contract").

 General statements about job security, company policy, or an employer's desire to retain an employee indefinitely are insufficient to overcome the presumption that employment is at will. *See, e.g., Ruud v. Great Plains Supply, Inc.,* 526 N.W.2d 369, 370–72 (Minn.1995) (concluding that, even in the context of discussions about becoming a store manager, statement that "[g]ood employees are taken care of" was not sufficiently definite to establish a permanent-employment contract). In ascertaining the nature of the employment relationship, courts must consider, among other things, the written and oral negotiations of the parties and the particular circumstances at issue. *Eklund v. Vincent Brass & Aluminum Co.,* 351 N.W.2d 371, 376 (Minn.App.1984), *review denied* (Minn. Nov. 1, 1984).

 The evidence Gunderson has presented is insufficient as a matter of law to sustain a finding that Jones's alleged assurances of job security clearly evidenced his intent to create a lifetime-employment contract. On the contrary, viewed in the light most favorable to Gunderson, the evidence establishes that Gunderson's employment was for an indefinite term and hence terminable at the will of either party with or without cause. Jones's alleged statement that Gunderson "would always be taken care of" is too vague and indefi-

nite to create an agreement that Gunderson would remain employed as long as he was a shareholder or until the company was sold.

In fact, Jones's alleged statement is similar to statements Minnesota courts have consistently deemed insufficient to overcome the presumption of at-will employment. *See, e.g., Cedarstrand v. Lutheran Broth.,* 263 Minn. 520, 523, 117 N.W.2d 213, 216 (1962) (concluding that employer's promise to give employees "job[s] as long as they wished until retirement" was insufficient to create more than at-will employment); *Aberman,* 414 N.W.2d at 771–772 (concluding that employer's promise that "I will always take care of you, you will always be with Malden" was insufficient to establish permanent-employment contract); *Dumas v. Kessler & Maguire Funeral Home, Inc.,* 380 N.W.2d 544, 547 (Minn.App.1986) (concluding that supervisor's statement to employee that they would "retire together" was insufficient as a matter of law to constitute agreement that employee could be discharged only for cause). Folken's alleged statement exhorting Gunderson to "stick with me and I will make you rich when we sell the company" is similarly insufficient to establish a basis for Gunderson's breach-of-employment-contract claim.

 Alternatively, Gunderson argues that he provided additional consideration beyond his employment services sufficient to create an implied contract for permanent employment by personally guaranteeing ACP's credit line and by departing from his previous employment to devote himself primarily to ACP. We disagree. To come within the independent-consideration exception to the at-will doctrine, consideration must be both uncharacteristic of the employment relation and regarded by the parties as consideration for a promise of job security. *See Degen,* 260 Minn. at

429–30, 110 N.W.2d at 867 (concluding that acceptance of salary reduction, forbearance of employment, and contributions to pension plan were insufficient to constitute additional consideration); *Skagerberg*, 197 Minn. at 300–03, 266 N.W. at 876–78 (concluding that forbearance of a lucrative consulting practice to accept new position did not constitute sufficient additional consideration to create implied contract limiting discharge to good cause); *Dumas*, 380 N.W.2d at 546 (stating that consideration for a promise of permanent employment must be regarded by the parties as such and must be the product of negotiation and mutual bargaining).

■ Gunderson's personal guaranty was insufficient additional consideration to create an implied contract for permanent employment. First, the guaranty was not additional consideration uncharacteristic of the employment relationship because Gunderson was not only an employee but was also a shareholder. Shareholders commonly guarantee corporate loans. Second, the record contains no indication that the parties regarded Gunderson's personal guaranty as consideration for a promise of permanent employment or that the guaranty was conditioned upon Gunderson continuing as an employee as long as he remained a shareholder. *Cf. Bussard v. College of St. Thomas, Inc.*, 294 Minn. 215, 223–24, 200 N.W.2d 155, 160–61 (1972) (reversing summary judgment for employer where employee donated $350,000 in stock to employer on condition that he would continue as publisher of company employer had purchased). The loan guaranties in this case are thus not indicative that the parties contemplated anything other than at-will employment.

■ The same is true of Gunderson's departure from his previous employment to devote himself primarily to ACP. Under Minnesota law, forbearance of ei-ther participation in an established business or work opportunities does not, by itself, constitute sufficient additional consideration to create an implied contract limiting discharge to good cause. *See Skagerberg*, 197 Minn. at 301, 266 N.W. at 877; *Aberman*, 414 N.W.2d at 772; *see also Ingle v. Glamore Motor Sales, Inc.*, 140 A.D.2d 493, 528 N.Y.S.2d 602, 604 (1988) (refusing to find implied contract to dismiss only for cause in absence of evidence that employer induced employee to leave previous employment with assurances that he could not be discharged except for cause), *aff'd*, 73 N.Y.2d 183, 538 N.Y.S.2d 771, 535 N.E.2d 1311 (1989). Gunderson has not demonstrated that Jones induced him to leave his previous employment with assurances of job security. Gunderson's mere expectation that by guaranteeing ACP's credit line he would secure continuing employment does not establish an enforceable agreement. *See Ingle*, 528 N.Y.S.2d at 604.

■ Gunderson last claims that the district court erred in dismissing his breach-of-employment-contract claim summarily because breach-of-employment-contract claims may not be dismissed on summary judgment. We disagree. Gunderson's claim is inconsistent with well-established Minnesota law. *See, e.g., Ruud*, 526 N.W.2d at 371–73 (dismissing breach-of-employment-contract claim on summary judgment); *Aberman*, 414 N.W.2d at 772–73 (same); *see also Harris v. Mardan Bus. Sys., Inc.*, 421 N.W.2d 350, 354–55 (Minn.App.1988) (affirming partial summary judgment on breach-of-fiduciary-duty and breach-of-employment-contract claims), *review denied* (Minn. May 18, 1988).

Because the evidence establishes as a matter of law that Gunderson's employment was at will, the district court proper-

ly dismissed Gunderson's breach-of-employment-contract claim.

## II

*Claim of Unfair Prejudice Toward Gunderson in his Capacity as a Close–Corporation Shareholder*

Gunderson next argues that the controlling shareholders acted in an unfairly prejudicial manner toward him in his capacity as a closely-held-corporation shareholder, in violation of Minn.Stat. § 302A.751, subd. 1(b)(3) (1998). Specifically, Gunderson argues that the controlling shareholders frustrated his reasonable expectations as a shareholder by enforcing the buy-sell agreement's involuntary-dismissal clause to remove him as a shareholder, by voting him out as officer and director, by offering to repurchase his stock at an unreasonably low price under the terms of the buy-sell agreement, and by failing to follow board directives or to seek board approval for decisions affecting the corporation. Gunderson seeks equitable relief or a fair-value buyout under Minn.Stat. § 302A.751, subd. 2 (1998). We conclude that Gunderson's claim is unsupported by the record and the applicable law.

Section 302A.751 allows courts to grant equitable relief to a shareholder in a corporation that is not publicly held when the directors or those in control of the corporation have "acted in a manner unfairly prejudicial" toward the shareholder in his or her capacity as shareholder or director. Minn.Stat. § 302A.751, subd. 1(b)(3). The legislature enacted section 302A.751 in 1981 in recognition that, given the lack of a ready market for their shares, minority shareholders in closely held corporations required enhanced protections. *See* Report to the Senate by Advisory Task Force on Corporation Law (1981) [Advisory Task Force Report], *reprinted in* Minn.Stat. Ann. § 302A.001 (West Supp.2000) (noting

that the Minnesota Business Corporations Act's provisions applicable to closely held corporations are characterized by "greatly enhanced shareholder protection").

Although the statute does not define the phrase "in a manner unfairly prejudicial toward * * * shareholders," we have interpreted the phrase to mean conduct that frustrates the reasonable expectations of all shareholders in their capacity as shareholders or directors of a corporation that is not publicly held or as officers or employees of a closely held corporation. *Berreman v. West Publ'g. Co.,* 615 N.W.2d 362, 374 (Minn.App.2000), *review denied* (Minn. Sept. 26, 2000). This interpretation is supported by the remedial provision in subdivision 3a, which specifically identifies reasonable expectations as a factor courts must consider in granting relief:

> **Considerations in granting relief involving closely held corporations.** In determining whether to order equitable relief, dissolution, or a buy-out, the court shall take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation and the reasonable expectations of all shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other. For purposes of this section, any written agreements, including employment agreements and buy-sell agreements, between or among shareholders or between or among one or more shareholders and the corporation are presumed to reflect the parties' reasonable expectations concerning matters dealt with in the agreements.

Minn.Stat. § 302A.751, subd. 3a (1998).

In addition to directing courts to consider reasonable expectations, subdi-

vision 3a directs courts to accord presumptive power to written agreements among shareholders or between shareholders and the corporation. *Id.* We conclude, consistent with the legislature's deference to written agreements, that courts may rely on written or oral agreements among shareholders or between shareholders and the corporation in determining whether shareholder expectations are reasonable. *See* Advisory Task Force Report, *supra,* (recognizing that deference to the parties' "actual associative bargain" is among the "fundamental functions of a sound business corporation law"). Courts may also look to a course of dealing that implies an agreement. *Cf., e.g.,* Minn.Stat. § 51A.02, subd. 3 (2000) (stating that "agreement" means bargain of parties found in contractual language or by implication from other circumstances including course of dealing).

■ In the absence of specific agreements, reasonable expectations may be determined by reference to the understandings "that would normally be expected to result from associative bargaining." *Berreman,* 615 N.W.2d at 374 (quoting Advisory Task Force Report, *supra*) (referring to goal of providing rules that would result from associative bargaining in absence of actual associative bargain). These imputed understandings or "hypothetical investment bargains" envision or make assumptions about the understandings objectively reasonable close-corporation shareholders would have reached if, at the venture's inception, they had bargained over how their investments should be protected. Douglas K. Moll, *Shareholder Oppression in Close Corporations: The Unanswered Question of Perspective,* 53 Vand. L.Rev. 749, 798 (2000) [hereinafter *Perspective*].

■ An additional touchstone for identifying reasonable expectations is the standard of conduct identified in the common law as fiduciary duty and referred to in subdivision 3a as "the duty which all shareholders in a closely held corporations owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation." Minn.Stat. § 302A.751, subd. 3a. The common law fiduciary duty, sometimes called the "duty of good faith and fair dealing," embraces both substantive obligations that focus on the outcomes of shareholder conduct and procedural obligations that focus on process. Daniel S. Kleinberger, *Why Not Good Faith? The Foibles of Fairness in the Law of Close Corporations,* 16 Wm. Mitchell L.Rev. 1143, 1156 (1990).

· ■ Those in control of closely held corporations have a substantive obligation, for instance, not to withhold dividends or use corporate assets preferentially. *See, e.g., Crosby v. Beam,* 47 Ohio St.3d 105, 548 N.E.2d 217, 221 (1989) (stating that majority shareholders breached fiduciary duty by using their controlling power to give themselves benefits not enjoyed by the minority shareholders); Kleinberger, *supra,* at 1157 (stating that "[i]t is substantively unfair and a breach of fiduciary duty for a controlling shareholder or group of shareholders to appropriate overmuch of the enterprise's economic benefits" or to " 'freeze out' minority shareholders, either directly (e.g., by cutting dividends and selectively cutting salaries) or indirectly (e.g., by siphoning off assets to other ventures)").

■ All close-corporation shareholders have a procedural obligation, on the other hand, not to engage in oppressive or unfair negotiating tactics that may otherwise "conform to the rough 'moral[s] of the marketplace.' " *Id.* at 1160 (quoting Justice Cardozo's famous admonition in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928)); *see Fewell v. Tappan,* 223 Minn. 483, 494, 27 N.W.2d 648,

654 (1947); *Evans v. Blesi,* 345 N.W.2d 775, 779–81 (Minn.App.1984) (concluding that the use of surprise, bluster, and intimidation to persuade a minority shareholder to sell out violated the duty of good faith and fair dealing), *review denied* (Minn. June 12, 1984). Close-corporation shareholders must similarly refrain from arbitrarily exercising discretion or veto power. *See, e.g., Smith v. Atlantic Properties, Inc.,* 12 Mass.App.Ct. 201, 422 N.E.2d 798, 803 (1981) (holding that a shareholder who repeatedly and unjustifiably exercised his contractual right to veto any declaration of dividends was liable to the corporation for damages resulting from the unwarranted retention of earnings). Likewise, close-corporation shareholders owe each other a duty of loyalty, which encompasses an obligation to act with complete candor in their negotiations with each other. *See, e.g., Berreman,* 615 N.W.2d at 371 (recognizing a fiduciary obligation to disclose material information about the corporation); *see also Helms v. Duckworth,* 249 F.2d 482, 487 (D.C.Cir.1957) (recognizing a fiduciary duty to disclose ulterior motives).

Because whether a shareholder's reasonable expectations have been frustrated is essentially a fact issue, summary judgment on Gunderson's unfair-prejudice claim is appropriate only if no rational factfinder could find either that the controlling shareholders frustrated his reasonable expectations as a shareholder by enforcing the provisions of the buy-sell agreement to remove him as shareholder and to repurchase his stock for $2,300 or that they operated the corporation in an unfairly prejudicial manner. After careful review we conclude that, on this record, no rational factfinder could make such a finding.

 Gunderson's expectations as a shareholder are presumptively reflected in the buy-sell agreement as to matters covered by the agreement. *See* Minn.Stat.

§ 302A.751, subd. 3a. We recognize that written agreements are not dispositive of shareholder expectations in all circumstances. *See Berreman,* 615 N.W.2d at 374. Often, shareholder expectations arise from understandings that are not expressly stated in the corporation's documents. *See In re Application of Topper,* 107 Misc.2d 25, 433 N.Y.S.2d 359, 365 (N.Y.Sup.Ct.1980) ("[I]n a close corporation the bargain of the participants is often not reflected in the corporation's charter, by-laws nor even in separate signed documents."); *see also* Moll, *Perspective,* 53 Vand. L.Rev. at 754, 798 (suggesting that reasonable expectations be defined by reference to "the understandings that would have been reached by objectively reasonable close corporation shareholders if, at the inception of the venture, they had bargained over how their investments should be protected").

 But written agreements should, nonetheless, be honored to the extent they specifically state the terms of the parties' bargain. The written agreement in this case specifically provided for the involuntary removal of shareholders with or without cause. It also set forth a method for valuing a departing shareholder's stock, which Gunderson proposed to "protect ACP if a partner [left] in a more or less hostile manner." The agreement was an arm's-length transaction. Gunderson spearheaded it and actively participated in drafting it. In fact, he proposed the very provision that authorized his involuntary removal, and urged the board to adopt it. He also selected the attorney who assisted the corporation in drafting the agreement. Given Gunderson's immediate and significant involvement in the preparation of the agreement, no rational factfinder could conclude that the agreement did not reflect his reasonable expectations as a shareholder. *See Blank v. Chelmsford Ob/*

*Gyn, P.C.,* 420 Mass. 404, 649 N.E.2d 1102, 1105 (1995) (stating that "[q]uestions of good faith and loyalty with respect to rights on termination or stock purchase do not arise when all the stockholders in advance enter into agreements for the purchase of stock of a withdrawing or a deceased stockholder").

Furthermore, Minnesota courts are required to honor shareholder agreements setting the purchase price of shares, unless the court determines that the price is unreasonable under all the circumstances. Minn.Stat. § 302A.751, subd. 2 (1998). The controlling shareholders offered Gunderson $2,300 for his shares pursuant to the buy-sell agreement. The district court correctly concluded that the contractual price was reasonable under all the circumstances. As mentioned previously, the buy-sell agreement was an arm's-length transaction. The shareholders had a legitimate business reason for agreeing to the provision under which Gunderson's shares were priced. And they all assumed the same risk. That the valuation method the shareholders agreed on resulted in a contractual purchase price lower than the appraised value of Gunderson's stock does not, by itself, establish a claim for breach of fiduciary duty. *Cf., e.g., Maschmeier v. Southside Press, Ltd.,* 435 N.W.2d 377, 382 (Iowa Ct.App.1988) ("We agree with the defendants that a contractual formula price is enforceable even if the formula price is less than its fair market value."); *Evangelista v. Holland,* 27 Mass.App.Ct. 244, 537 N.E.2d 589, 592–93 (1989) (holding that shareholder agreement was enforceable even though price to be paid under the agreement was lower than stock's market value); *Gallagher v. Lambert,* 74 N.Y.2d 562, 549 N.Y.S.2d 945, 549 N.E.2d 136, 137–38 (1989) (affirming an award of book value pursuant to the terms of a termination-

triggered buyout agreement and noting that the defendant had "fulfilled its fiduciary duty" by abiding by the terms of the agreement); *Ingle,* 528 N.Y.S.2d at 604 (concluding that "a fiduciary duty does not arise out of a shareholders' agreement * * * where the minority shareholder has assented to a mandatory repurchase-upon-termination-of-employment clause").

Thus, in the absence of evidence that the controlling shareholders used the buy-sell agreement manipulatively to force the sale of Gunderson's shares, the facts do not support Gunderson's claim that the controlling shareholders frustrated his reasonable shareholder expectations by enforcing the buy-sell agreement. *Cf. A.W. Chesterton Co. v. Chesterton,* 907 F.Supp. 19, 23–25 (D.Mass.1995) (holding that majority shareholders were entitled to preliminary injunctive relief against minority shareholder's coercive scheme to force the corporation to repurchase his shares under a first-refusal provision in company's articles of organization, even though minority shareholder acted within the letter of the corporate documents).

Gunderson's claim that Jones and Folken frustrated his reasonable expectations as a shareholder by failing to follow board directives and to obtain board approval for decisions affecting the corporation similarly fails. Ordinarily, shareholders in a typical close corporation have a reasonable expectation that the controlling shareholders will follow board directives and will seek board approval for decisions affecting the corporation. But the circumstances underlying the formation of a close corporation and the shareholders' practice thereafter may change that expectation and alter the shareholders' fiduciary duty.

The expectation that shareholders would routinely follow board directives and seek approval for decisions affecting the corporation changed at ACP. From the

outset, ACP operated informally, without either a budget or corporate bylaws. Gunderson testified that he, Folken, and Jones met monthly to discuss corporate issues and made decisions affecting the corporation without first seeking board approval. He could not, therefore, have had a legitimate expectation that the controlling shareholders would routinely seek board approval for decisions affecting the corporation. In the absence of conduct that wrongfully frustrates legitimate shareholder expectations, the failure routinely to seek board approval for corporate decisions is insufficient to support a claim under Minn.Stat. § 302A.751, subd. 1(b)(3). *See Masinter v. WEBCO Co.*, 164 W.Va. 241, 262 S.E.2d 433, 442 (1980) (concluding that "[m]ere procedural irregularity in the holding of corporate meetings * * * is not alone sufficient to constitute a cause of action under a 'freeze-out' theory").

More important, Gunderson acquiesced in the decisions he claims Jones and Folken made without first obtaining board approval. Gunderson cannot now conveniently premise a claim of unfairly prejudicial conduct on the very practice in which he participated routinely without objection. *Cf. Brenner v. Berkowitz*, 134 N.J. 488, 634 A.2d 1019, 1029 (1993) (stating that a "court could reasonably determine that unfairness would result if a minority shareholder were permitted to seek judicial intervention after years of acquiescence or participation in the alleged misconduct"); *Masinter*, 262 S.E.2d. at 443 (stating that shareholder who acquiesced in corporate informality by participating in it without dissent will not thereafter be permitted to challenge it).

Even if Gunderson's claim had a legal basis, it lacks a factual basis. Contrary to Gunderson's allegation, the board participated in the decision to hire Mike Folken and to allow Jones to transfer 10% of his stock to him. By Gunderson's own admission, the board also participated in the decision to lease additional space. Gunderson signed the leases himself, believing, based on conversations with other shareholders, that he had the requisite authority and that specific board approval was not necessary. Gunderson's mismanagement claim thus lacks a factual basis.

■ Gunderson alternatively claims that ACP breached its duty of loyalty by failing to disclose that (1) the attorney who represented the corporation's interests in the preparation of the buy-sell agreement had a conflict of interest, (2) Gunderson was giving up significant minority-shareholder rights under the agreement, and (3) the agreement could be used unfairly to defeat his reasonable expectations as a shareholder. Gunderson's claim lacks a legal basis. The duty to disclose does not extend to obvious matters. Gunderson was a seasoned businessman. He took an active role in drafting the buy-sell agreement and selected the attorney who represented the corporation. Most important, Gunderson proposed the provisions he now claims defeated his reasonable expectations, and he urged the board to adopt them. Accordingly, he had knowledge of the information he claims ACP failed to disclose in violation of its fiduciary duty to him. His claim that the controlling shareholders violated their fiduciary duty of loyalty therefore fails.

■ The same is true of Gunderson's claim that the majority shareholders breached their duty to act fairly and honestly by conspiring to preclude him from having a meaningful role in corporate management. The record conclusively establishes that Gunderson met regularly with Jones and Folken to discuss the corporation and that he prepared the corporation's financial statements and presented them to

the board through September 1998. Barb Prescher, hired at Gunderson's request to take over his daily financial responsibilities, prepared and presented the statements thereafter. Gunderson admitted in deposition testimony that the lockbox system he now claims prevented him from auditing company deposits allowed for quicker and more reliable deposits and was a good idea. He also admitted that he had no factual basis for his claim that the controlling shareholders had anything to do with the password Prescher set up to gain access to the computer program containing the corporation's financial information. Moreover, the record contains no evidence that Prescher denied him access to information he requested.

Because the record conclusively establishes that the controlling shareholders acted consistently with the reasonable expectations of all shareholders in their capacity as shareholders, the district court properly dismissed Gunderson's claim that ACP acted in a manner unfairly prejudicial toward him in his capacity as shareholder.

### III

*Claim of Unfair Prejudice Toward Gunderson as a Shareholder–Employee*

Gunderson next argues that by terminating his employment, the controlling shareholders acted in a manner unfairly prejudicial to him in his capacity as a shareholder-employee. Specifically, Gunderson claims that the at-will-employment doctrine notwithstanding, the district court erred in dismissing his claim of unfairly prejudicial conduct because, at a minimum, an issue of material fact remains on whether ACP frustrated his reasonable expectations as a shareholder-employee by terminating his employment.

Minn.Stat. § 302A.751, subd. 1(b)(3), specifically recognizes that closely-held-

corporation shareholders may obtain equitable relief when "the directors or those in control of the corporation have acted in a manner unfairly prejudicial toward [them] in their capacit[y] as * * * employees of a closely held corporation." Minn.Stat. § 302A.751, subd. 1(b)(3). To survive summary judgment on his claim that the controlling shareholders unfairly prejudiced him in his capacity as a shareholder-employee, Gunderson must establish, at a minimum, that genuine issues of material fact remain on whether the controlling shareholders frustrated his reasonable expectations as a shareholder-employee by terminating his employment.

■ Typical close-corporation shareholders commonly have an expectation of continuing employment with the corporation. *Pedro v. Pedro,* 489 N.W.2d 798, 802 (Minn.App.1992) (*Pedro II*) (stating that the reasonable expectations of close-corporation shareholders include a job, a salary, and a significant place in management), *review denied* (Minn. Oct. 20, 1992); *Pedro v. Pedro,* 463 N.W.2d 285, 289 (Minn.App. 1990) (*Pedro I* ) (stating that "the primary expectations of minority shareholders include an active voice in [the] management of the corporation and input as an employee"), *review denied* (Minn. Jan. 24, 1991). In fact, because of the unique characteristics of close corporations, employment is often a vital component of a close-corporation shareholder's return on investment and a principal source of income. *See* Kleinberger, *supra,* at 1148 (describing the unique characteristics of close corporations). The discharge of a shareholder-employee may thus be grounds for equitable relief. *See* Minn.Stat. Ann. § 302A.751 reporter's notes 1982–84 (West 1985) (noting that the statute includes "the discharge of a shareholder-employee as a ground [for relief], if that discharge was 'unfairly prejudicial' ").

Accordingly, even though Gunderson was an at-will employee and, therefore, not wrongfully discharged in the breach-of-contract or tort sense, his employment termination triggers a separate inquiry into whether ACP unfairly prejudiced Gunderson in his capacity as a shareholder-employee. The doctrine of employment-based shareholder oppression is distinct from the wrongful-termination doctrine, and the analysis under the separate doctrines should attempt to protect close-corporation employment and, at the same time, respect the legitimate sphere of the at-will rule.

█ The wrongful-termination doctrine affords discharged employees of *all* corporations a remedy in the form of wages and/or reinstatement, regardless of whether they are also shareholders, if they can establish the existence of an express or an implied contractual agreement or a promise inducing reliance. Deborah A. Schmedemann, *Fired Employees and/or Frozen-Out Shareholders (An Essay)*, 22 Wm. Mitchell L.Rev. 1435, 1439–46 (1996); Schlafge, *supra*, at 1086. *But see Pedro I*, 463 N.W.2d at 289–90 (suggesting that a close-corporation shareholder's reasonable expectation of employment with the corporation, rather than a contractual agreement, is an appropriate basis for a wrongful-termination claim despite the at-will doctrine); Schlafge, *supra*, at 1089–96 (concluding that the *Pedro I* court "extended the law too far in its efforts to compensate a sympathetic plaintiff"). The threshold question in wrongful-termination cases, therefore, is whether a contractual agreement or a promise inducing reliance existed.

█ The oppression doctrine, on the other hand, affords closely-held-corporation shareholders relief when the controlling shareholders frustrate their reasonable expectations as shareholder-employees. *See Berreman*, 615 N.W.2d at 374. Accordingly, the threshold question in the context of a claim of shareholder oppression based on the termination of employment is whether a minority shareholder's expectation of continuing employment is reasonable.

Not all expectations of continuing employment are reasonable. For example, shareholders who sign buyout agreements permitting termination of employment for any reason and obligating shareholders to sell their shares to the corporation upon termination of employment would not likely have a reasonable expectation of continuing employment. *See, e.g., In re Apple*, 224 A.D.2d 1016, 637 N.Y.S.2d 534, 535 (1996) (stating that a terminated employee who signed an agreement binding him to sell his stock to the company after discontinuing his employment with the corporation for any reason "cannot be heard to argue that he had a reasonable expectation that he would be employed * * * for life"); *Ingle*, 528 N.Y.S.2d at 604 (same). Similarly, an employee who has no capital investment in the corporation but either buys a small percentage of stock through periodic company offerings or receives a small percentage of stock as part of a compensation package most likely lacks a reasonable expectation of continuing employment. *Cf., e.g., Merola v. Exergen Corp.*, 423 Mass. 461, 668 N.E.2d 351, 354 (1996) (holding the evidence was insufficient to support finding that majority shareholder breached his fiduciary duty by terminating employment of shareholder-employee who purchased stock through periodic company offerings because "there was no general policy regarding stock ownership and employment, and there was no evidence that any other stockholders had expectations of continuing employment because they purchased stock," that employment was a source of de facto

dividends, or that the employee was required to buy stock as a condition of employment); *Harris*, 421 N.W.2d at 353 (holding, without mentioning reasonable expectations, that a close-corporation shareholder who acquired a small percentage of stock as part of compensation package but did not invest capital in the venture did not stand in a fiduciary relation with the shareholder who founded and funded the venture).

An expectation of continuing employment is reasonable in the first instance if "continu[ing] employment can fairly be characterized as part of the shareholder's investment." Douglas K. Moll, *Shareholder Oppression v. Employment at Will in the Close Corporation: The Investment Model Solution*, 1999 U. Ill. L.Rev. 517, 551–52 (1999) (proposing an "investment model of oppression" under which "oppression liability arises when the value of a shareholder's investment is harmed" and stating that the proper inquiry in loss-of-employment oppression cases is "whether the shareholder reasonably expected that her investment in the venture entitled her to continued employment with the close corporation") (footnote omitted). Factors to be considered in determining whether shareholders reasonably expected that their investment would entitle them to continuing employment include, among others, whether a shareholder's salary and benefits constitute de facto dividends and whether procuring employment with the corporation was a significant reason for investing in the business. *See id.* at 547–51 (noting that "in the close corporation setting, a job can be part of an investment in a de facto dividend sense and in a procurement of employment sense") (footnotes omitted).

Additionally, to be reasonable, an expectation of continuing employment must be known and accepted by other shareholders. *See* Minn.Stat. § 302A.751, subd. 3a (directing courts to consider the expectations of *all* shareholders in awarding relief); *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551, 563 (1983) (stating that privately held expectations are not reasonable); Moll, *Perspective, supra*, at 776 (stating that "[a] protected 'reasonable expectation' does not arise until * * * the court is satisfied that *all* of the investors shared a basic understanding * * * at the venture's inception") (emphasis added). Accordingly, a claim of oppression or unfairly prejudicial conduct may not be predicated on the failure to fulfill a minority shareholder's "subjective hopes and desires in joining the venture." *In re Dissolution of Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173, 1179 (1984). Instead, "oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and * * * central to the [minority shareholder's] decision to join the venture." *Id.*

Expectations of continuing employment must also be balanced against the controlling shareholder's need for flexibility to run the business in a productive manner. *See, e.g., Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657, 663 (1976) (expressing concern that the "untempered application of the strict good-faith standard * * * will result in the imposition of limitations on legitimate action by the controlling group in a close corporation which will unduly hamper its effectiveness in managing the corporation in the best interests of all concerned," and concluding that no breach of fiduciary duty occurs if "the controlling group can demonstrate a legitimate business purpose for its action"); *Brenner*, 634 A.2d at 1033 (concluding that "[a] shareholder's expectation of employment must

be balanced against the corporation's ability to run its business efficiently"); Moll, *Perspective, supra,* at 776 (suggesting that "the propriety and justifiability of the majority's conduct [must be taken into account] to the extent that the majority's proffered justification sheds light on whether the minority's expectation was reasonable in the circumstances at issue") (footnote omitted).

■ Accordingly, an expectation of continuing employment is not reasonable and oppression liability does not arise when the shareholder-employee's own misconduct or incompetence causes the termination of employment. *See, e.g., Exadaktilos v. Cinnaminson Realty Co.,* 167 N.J.Super. 141, 400 A.2d 554, 562 (Law Div.1979) (no oppression liability found when minority shareholder failed to satisfy the condition precedent to employment in the company, namely, "that he learn the business"); *Kemp,* 484 N.Y.S.2d at 806, 473 N.E.2d 1173 (observing that "the minority shareholder whose own acts, made in bad faith and undertaken with a view toward forcing an involuntary dissolution, give rise to the complained-of oppression should be given no quarter in the statutory protection"); *Gimpel v. Bolstein,* 125 Misc.2d 45, 477 N.Y.S.2d 1014, 1017, 1019–20 (N.Y.Sup.Ct.1984) (observing that "[i]t was clearly not wrongful for the corporate victim of a theft to exclude the thief from the councils of power" and noting that "the only expectation [a terminated shareholder-employee who stole from the company] could reasonably entertain were those of a discovered thief: ostracism and prosecution"); *see* Moll, *Perspective, supra,* at 776 (suggesting that a reasonable expectation is protected only when "the court is satisfied that all of the investors intended th[e] basic understanding [reached at the venture's inception] to persist in the post-inception circumstances that arise").

■ Gunderson claims he had a reasonable expectation of continuing employment as a matter of law by virtue of his shareholder status, the business plan, and Jones's alleged promises of job security. On these facts, we cannot agree. Any expectation Gunderson had based on the business plan is unreasonable because the shareholders never adopted the plan or even learned of it. Jones's alleged promises, however, may be probative of Gunderson's claim that his expectation of continuing employment was reasonable, even though the promises were insufficiently definite to create a contractual agreement. *See* Schmedemann, *supra,* at 1452 n. 99 ("Presumably an 'expectation' is more easily formed than an 'agreement.'"). But because the buy-sell agreement does not address the parties' expectations on employment matters and the record is insufficiently developed, we conclude that genuine issues of material fact remain on whether Gunderson reasonably expected that his investment in ACP would entitle him to continuing employment with the corporation and whether any expectation of employment he may have had was altered by the parties' subsequent dealings or by Gunderson's alleged misconduct.

Accordingly, we reverse the district court's dismissal of Gunderson's claim for unfairly prejudicial conduct as it relates solely to his reasonable expectations as a shareholder-employee, and we remand for further proceedings on that claim.

## DECISION

Because the record conclusively establishes as a matter of law that Gunderson's employment was at-will and could, therefore, be terminated at the will of either party with or without cause, the district court properly dismissed Gunderson's common-law breach-of-employment-contract claim. Likewise, the district court proper-

ly dismissed Gunderson's first statutory claim that the controlling shareholders acted in a manner unfairly prejudicial toward him in his capacity as a shareholder by enforcing the buy-sell agreement. But Gunderson's second statutory claim, that the controlling shareholders acted in a manner unfairly prejudicial toward him in his capacity as an employee, is adequately supported by evidence raising issues of material fact on whether Gunderson had a reasonable expectation of continuing employment, and thus summary judgment on that claim was not appropriate. The denial of the fair-value buyout motion was premature.

**Affirmed in part and reversed and remanded in part.**